**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 24, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 17-5118

AARON WILKIE MURPHY,

Defendant - Appellant.

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:17-CR-00005-CVE-1)**

Submitted on the briefs:[*]

Virginia L. Grady, Federal Public Defender, and O. Dean Sanderford, Assistant Federal Public Defender, Office of the Federal Public Defender, Denver, Colorado, for Defendant - Appellant.

R. Trent Shores, United States Attorney, and Richard M. Cella, Assistant United States Attorney, Tulsa, Oklahoma, for Plaintiff-Appellee.

Before **TYMKOVICH**, Chief Judge, **O'BRIEN**, and **MATHESON**, Circuit Judges.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument.

**O'BRIEN**, Circuit Judge.

Aaron Wilkie Murphy is a convicted drug dealer and admitted addict. He used his home for drug-related activity. The only issue is whether that use of his home was enough to warrant an enhancement to his sentence under USSG § 2D1.1(b)(12), which increases guideline sentences when drug-related activities are one of the home's primary, as opposed to incidental, uses. The district judge properly applied the enhancement. We affirm.

## I. Background

In late 2015, local law enforcement officers targeted Murphy in an investigation involving the sale of stolen property. They executed a search warrant at his residence in Broken Arrow, Oklahoma, on November 3, 2015. He was not home at the time of the search, which uncovered multiple stolen items as well as 32.5 grams of heroin, $2,391 in cash, digital scales, and a handgun. Officers obtained a warrant for Murphy's arrest.

Several weeks later, on November 25, 2015, officers found and arrested Murphy at his residence, which they again searched pursuant to a warrant. In a safe, they found 42.15 grams of heroin and $33,900 in cash, comprised solely of $50 and $100 bills. They also seized 28.55 grams of methamphetamine and multiple stolen items. The state court released Murphy on bond on November 27, 2015.

In January 2016, officers received information from an individual who had been in Murphy's residence that approximately one pound of methamphetamine would be found

there. On a separate occasion, they observed Murphy selling methamphetamine to an individual in the parking lot of a local gym. They later learned that Murphy had sold methamphetamine to the same individual on at least ten prior occasions; two of those sales occurred at Murphy's residence. A search of the trash from the residence revealed four plastic baggies containing methamphetamine residue.[1]

On February 18, 2016, officers traveled to Murphy's residence to execute a search warrant.[2] On the way, they found Murphy in his vehicle and arrested him. Inside the vehicle was 118 grams of methamphetamine and his cellular telephone. The telephone contained text messages of drug transactions. The search of his residence revealed, among other things, heroin residue, a bullet proof vest, digital scales with residue, drug paraphernalia, and keys to a storage unit rented by Murphy in which a rifle was later found. Curiously, the state court again released Murphy on bond on March 29, 2016.

On November 22, 2016, officers, with a warrant in hand, searched Murphy's residence a fourth time. As they approached the residence, they observed surveillance cameras. Their search of the home revealed a baggie, which turned out to contain heroin,

---

[1] The relevant facts come from the Presentence Investigation Report (PSR), which does not indicate when the parking lot sale or search of the trash occurred. From context, it appears those events took place in early 2016.

[2] The PSR indicates the February 2016 search occurred pursuant to a <u>federal</u> warrant. It does not indicate whether the other search warrants in this case were issued by a federal or state court. Moreover, it is unclear why the February 2016 search warrant was federal in nature. The PSR does not reveal when federal law enforcement became involved. We do know, however, that Murphy never challenged any of the officers' actions (whether local or federal) in this case.

floating in the bathroom toilet. They also found: (1) a baggie of methamphetamine, syringes, and other drug paraphernalia throughout the bathroom, (2) a shotgun in a bedroom closet, and (3) digital scales, baggies, drug residue, and more surveillance cameras in the office. Murphy was arrested and admitted responsibility for the heroin and methamphetamine found in his home. He also admitted "he had been distributing methamphetamine and heroin for some time and that, in the past, he had received pound quantities of methamphetamine and several ounces of heroin at a time." (Supp. R. Vol. 2 at 6.) He was charged in Oklahoma state court with various drug and firearm offenses, which were dismissed when he finally faced federal charges.[3]

Murphy was indicted for two counts of possession with intent to distribute heroin (Counts 2 and 5), two counts of possession with intent to distribute methamphetamine (Counts 4 and 6), two counts of being a felon in possession of a firearm (Counts 1 and 7), and one count of possession of a firearm in furtherance of a drug-trafficking crime (Count 3). He pled guilty to all counts except Count 3, which the government dismissed in exchange for his guilty plea.[4]

The Presentence Investigation Report (PSR), which was based upon the 2016 version of the United States Sentencing Guidelines Manual, concluded the offense

---

[3] Although Murphy was arrested three times between November 2015 and November 2016, he faced no substantial consequences for his actions until the federal government stepped in.

[4] Dismissal of Count 3 allowed Murphy to avoid a consecutive five-year term of imprisonment. *See* 18 U.S.C. § 924(c)(1)(A)(i).

involved at least 354.37 grams of heroin and 146.55 grams of methamphetamine, resulting in a base offense level of 26.[5]  *See* USSG § 2D1.1(c)(7) & comment. (n.8(B), (D)).  Two levels were added because Murphy possessed a dangerous weapon.  *See* USSG § 2D1.1(b)(1).  Two more levels were added because Murphy maintained a premises, his residence, for the purpose of manufacturing or distributing a controlled substance.  *See* USSG § 2D1.1(b)(12).  After a three-level downward adjustment for acceptance of responsibility, *see* USSG § 3E1.1, the total offense level was 27.  That, coupled with a Criminal History Category of IV, set the advisory guideline range at 100 to 120 months imprisonment for Counts 1 and 7 and 100 to 125 months imprisonment for Counts 2, 4, 5, and 6.[6]

Murphy objected to the § 2D1.1(b)(12) premises enhancement.  The commentary to that guideline requires the manufacturing or distribution of drugs be a primary or principal use of the premises, not merely an incidental or collateral one.  He claimed he

---

[5] Although the searches of Murphy's residence uncovered 74.65 grams of heroin, the PSR concluded he was responsible for 354.37 grams of heroin because between June 2015 and November 2015 (25 weeks), he sold a ½ ounce of heroin per week, for a total of 12.5 ounces or 354.7 grams.  The amount of methamphetamine attributed to Murphy (146.55 grams) derived from the November 3, 2015 search of his residence (28.55 grams) and the February 18, 2016 vehicle search (118 grams).  Murphy did not object to these quantities.  Because more than one drug was involved, the PSR converted the heroin and methamphetamine amounts into their marijuana equivalencies; that conversion resulted in a total of 647.47 kilograms of marijuana and a base offense level of 26.  *See* USSG § 2D1.1(c)(7) & comment. (n.8(B), (D)).

[6] The guideline range maximum was lower for the felon in possession counts (Counts 1 and 7) than for the drug counts (Counts 2, 4, 5, and 6) because the statutory maximum term for the former counts is 10 years (120 months).  *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2).

primarily used the premises as his home, having slept and eaten there on a daily basis for over 10 years. His drug-related activities, on the other hand, were a mere incidental use because, with the exception of two drug sales, the trafficking occurred outside his home.

The district judge would have none of it:

> In this case, the defendant distributed methamphetamine from his home on at least two occasions. He also used his home for storage of large quantities of methamphetamine and heroin, proceeds obtained from illegal activities, and distribution materials, including digital scales and baggies on at least four occasions when his home was searched by law enforcement.
>
> Further, law enforcement observed the defendant traveling directly from his residence to complete drug transactions also implying ongoing storage at his residence.
>
> [T]he defendant cites two cases in which the court determined that the enhancement was not proper. In *United States vs. Job*, 851 F.3d, 889, 909, Ninth Circuit, 2017, there was no evidence that the defendant had ever distributed methamphetamine out of his home.
>
> And in *U.S. vs. Ortiz*, 807 F.Supp.2d, 746, Northern District of Illinois, 2011, the use of the residence to receive a single shipment of drugs was found insufficient to support the enhancement.
>
> The court finds that the actions by the defendant in the instant offense go beyond the actions of the defendants in both *Job* and *Ortiz*; therefore, the court finds that the defendant's residence was used by the defendant for substantial drug trafficking purposes on an ongoing basis and drug trafficking was a primary use for the premises.

(Supp. R. Vol. 1 at 19-20.) She did decide, however, that a four-level downward departure was appropriate,[7] resulting in a total offense level of 23 and an advisory guideline range of 70-87 months. In toto, she sentenced Murphy to 70 months

---

[7] The government had moved for a two-level downward departure.

imprisonment. Interestingly, the sentence imposed falls within the applicable guideline

range (57-71 months) if the § 2D1.1(b)(12) enhancement is not considered.

## II. Discussion

USSG § 2D1.1(b)(12) calls for a two-level enhancement to the base offense level

if "the defendant maintained a premises for the purpose of manufacturing or distributing

a controlled substance." This includes "storage of a controlled substance for the purpose

of distribution." USSG § 2D1.1(b)(12), comment. (n.17).

Murphy does not quarrel about whether he "maintained" the premises. Instead, he

argues his "maintenance" of it was not "for the purpose of manufacturing or distributing a

controlled substance." Because he does not dispute the underlying facts found by the

district judge for purposes of this appeal, our review is de novo. *See United States v.*

*Cherry*, 572 F.3d 829, 831 (10th Cir. 2009) ("We review de novo whether the facts found

by the court support the application of the guideline it selected.").

*A. Interpretation of the Guideline*

The commentary to § 2D1.1(b)(12), which is authoritative, addresses when a

premises is maintained "for the purpose of manufacturing or distributing drugs":

> Manufacturing or distributing a controlled substance need not be the sole purpose
> for which the premises was maintained, but must be <u>one of the</u> defendant's
> primary or principal uses for the premises, rather than one of the defendant's
> incidental or collateral uses for the premises. In making this determination, the
> court should <u>consider</u> how frequently the premises was used by the defendant for
> manufacturing or distributing a controlled substance and how frequently the
> premises was used by the defendant for lawful purposes.

USSG § 2D1.1, comment. (n.17) (emphasis added); *see also Stinson v. United States*, 508 U.S. 36, 38 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

The enhancement clearly contemplates a premises with more than one primary use. Therefore, as Murphy concedes, a multiple use approach is applicable to cases, like this one, where the premises at issue is the defendant's home. *See United States v. Henderson*, 604 F. App'x 655, 658-59 (10th Cir. 2015) (unpublished) (applying enhancement where defendant used his home to distribute methamphetamine); *see also United States v. Bell*, 766 F.3d 634, 638 (6th Cir. 2014) ("Living in a residence and cooking drugs in it can both be relevant purposes under the guideline. . . . [P]recedents under the guideline do not carve out residences as safe havens from being drug-production premises."); *United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012) ("§ 2D1.1(b)(12) applies when a defendant uses the premises for the purpose of substantial drug-trafficking activities, even if the premises was also her family home at the times in question."). Murphy proposes that when the subject premises is the defendant's home, the enhancement applies "only when the defendant pervasively and persistently used his home to further a drug business." (Appellant's Op. Br. at 6.) His proposal finds no support in either the guideline or case law.

The commentary to the guideline requires drug-related activity to be one of the defendant's primary uses of the premises. It admits to no exception because the premises

is the defendant's home. It requires <u>consideration</u> of "how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." USSG § 2D1.1, comment. (n.17). Some circuits have concluded that when the premises at issue is the defendant's home, simply comparing the frequency of unlawful activity with the frequency of lawful activity is impractical. *United States v. Contreras*, 874 F.3d 280, 284 (7th Cir. 2017); *Miller*, 698 F.3d at 707. According to them, such comparison "would immunize every family home that is also used for drug distribution from being deemed an illegal maintained premises," *Contreras*, 874 F.3d at 284 (quotation marks omitted), because "[w]hen the premises in question [is] the defendant's family home, by definition it [is] used for that lawful purpose 100% of the time." *Miller*, 698 F.3d at 707. Such could not have been the intent of the guideline. *Id.* ("Congress . . . in directing the [United States Sentencing] Commission to adopt § 2D1.1(b)(12) surely intended to deter the manufacture and distribution of illegal drugs in 'crack houses' where children are being raised."). We agree in principle and offer an observation.

Most people do not occupy their home 100% of the time; they spend much time at work, on vacation, running errands, pursuing social activities, etc. While a home may not be occupied 100% of the time, it is considered to be a home 100% of the time in that it is always available to the owner (or renter), it contains most of the owner's possessions, and it is a safe haven. That same reasoning is apt in multiple use situations. Actual drug dealing may not be a constant in a home, but the home may well serve as a safe place to

- 9 -

store drugs, cash derived from drug sales (thereby shielding it from official notice), and tools of the trade (such as equipment related to selling drugs and firearms), as well as serve as a headquarters for drug-related operations. With that in mind, one may <u>use</u> his home (in the broad sense of the word) for lawful purposes 100% of the time and also <u>use</u> it (in the same broad sense of the word) for unlawful drug activity 100% of the time. In other words, both simultaneous uses may well be primary.

The commentary does not require a <u>comparison</u> of the frequency of lawful and unlawful activity at the premises. It requires only that a court "consider" such frequency in deciding whether drug-related activities were a primary, rather than incidental, use of the premises.[8] While it requires consideration of the frequency of unlawful and lawful activity at the premises, it does not foreclose consideration of other factors. Our case law, and that of other circuits, instructs that for drug-related activity to constitute a primary use of the residence, it must not only be frequent but also substantial. *Henderson*, 604 F. App'x at 659 ("[A]lthough the premises was used as a residence, the drug trafficking activities were frequent and substantial enough to warrant the enhancement."); *see also Contreras*, 874 F.3d at 284 ("Instead of merely weighing the amount of legal activity against the illegal activity, the sentencing court should focus on both the frequency and significance of the illicit activities . . . ."); *Bell*, 766 F.3d at 637

---

[8] *But see Henderson*, 604 F. App'x at 658 ("[T]he commentary to [USSG § 2D1.1(b)(12)] explicitly directs courts *to compare* the frequency of licit and illicit uses of the property." (emphasis added)).

("We assess the primary or principal use of the home . . . by comparing the frequency of lawful to unlawful use.  At bottom, the question is whether Bell's home played a significant part in distributing drugs." (quotation marks omitted)); *Miller*, 698 F.3d at 707 ("§ 2D1.1(b)(12) applies when a defendant uses the premises for the purpose of *substantial* drug-trafficking activities, even if the premises was also her family home at the times in question." (emphasis added)).  The analysis comes down to a "totality of the circumstances" evaluation, something trial judges are well equipped for and regularly perform.  And the frequent/substantial metric is a reciprocal sliding scale.  A substantial drug distribution that regularly and quickly passes through the home (two or three days) on a bi-monthly or tri-monthly basis may qualify as a primary use of the premises for drug-related purposes much the same as an exquisitely frequent, but relatively paltry, operation.

A totality of the circumstances assessment includes: (1) the frequency and number of drugs sales occurring at the home; (2) the quantities of drugs bought, sold, manufactured, or stored in the home; (3) whether drug proceeds, employees, customers, and tools of the drug trade (firearms, digital scales, laboratory equipment, and packaging materials) are present in the home, and (4) the significance of the premises to the drug venture.  *See Henderson*, 604 F. App'x at 658; *United States v. Verners*, 53 F.3d 291, 296-97 (10th Cir. 1995);[9] *see also Contreras*, 874 F.3d at 284-85; *United States v.*

---

[9] *Verners* addressed § 2D1.1(b)(12)'s statutory equivalent, 21 U.S.C. § 856(a)(1). That statute, referred to as the "crack-house statute," prohibits "knowingly . . .

*George*, 872 F.3d 1197, 1206 (11th Cir. 2017); *Bell,* 766 F.3d at 637; *United States v. Johnson*, 737 F.3d 444, 447-48 (6th Cir. 2013); *Miller*, 698 F.3d at 706-07.

Murphy objects, proposing his "pervasive and persistent" test is necessary because anything less "could lead to . . . application [of the enhancement] in nearly all cases under § 2D1.1." (Appellant's Op. Br. at 11.) As he explains it:

> Drug dealers and manufacturers invariably maintain a supply of drugs. And even those who do not always keep drugs in their own home will likely do so at least sometimes. To construe the [enhancement] to apply to episodic use of a home for drug-related purposes would effectively transform the provision from [one] intended to apply only in cases with a certain aggravating feature into a provision that elevates the offense level in nearly all § 2D1.1 cases.

(*Id*.) But looking to both the size and the scope of the drug-related use of the home alleviates this concern. It ensures the enhancement will not apply when that use is truly "incidental."

That said and as we will now explain, Murphy's global concern is unwarranted here. His drug-related use of his home was chronic, not merely episodic, and even seemingly paltry amounts[10] gain significance over time.

*B. Application of the Guideline*

---

maintain[ing] any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance." Because we have interpreted the statute similar to the guideline, we find *Verner*'s discussion of § 856(a)(1) instructive.

[10] Murphy's drug distribution could hardly be called paltry (eleven sales to one buyer, two of which occurred in his home). *See supra* p. 3.

Murphy argues the enhancement was unwarranted here because the evidence showed only that he "sometimes used his house for drug-related activities." (Appellant's Op. Br. at 13.) We beg to differ. Murphy's use of his home for occasional sales, as a safe haven, a warehouse, and a headquarters for drug distribution put him well past the "frequent and substantial" use threshold.

Murphy admitted to having received and distributed pound quantities of methamphetamine and several ounces of heroin at one time. Consistent with his admissions, distribution quantities of heroin and methamphetamine were found in his home in November 2015 and one pound of methamphetamine was present in his home in January 2016. In February 2016, he was found in his vehicle "near his home" with a large quantity of methamphetamine, and in early 2016, he was observed selling methamphetamine in the parking lot of a "local" gym. (Supp. R. Vol. 2 at 5-6.) A reasonable inference from this evidence is that the methamphetamine found in his vehicle and sold in the parking lot was initially stored in and passed through his home, with his vehicle being the means by which he distributed drugs. Moreover, one or more tools of the drug trade (firearms, digital scales, bullet proof vest, baggies, and surveillance cameras) were found in all but one search of his residence. On two of those occasions, a large amount of cash was also found. Murphy also conducted at least two drug sales in his home.

Any totality of the circumstances evaluation admits to, perhaps demands, reasonable inferences if drawn from known facts or common sense. Based on the amount

($36,291 total), the cash found in Murphy's home was probably drug proceeds. Other items found in the home are also damning.[11] In addition, Murphy's circumstances during the relevant time are relevant. He had no legitimate employment or other identifiable and legitimate source of income. Drug-trafficking (and theft) seem to be his main, if not sole, source of funds (and a substantial one, at that). Add to that the four searches, each of which revealed evidence of drug-trafficking and most of which occurred while he was on bond in a criminal case. That reveals a committed course of criminal conduct relevant to the issue at hand.

Citing no legal authority, Murphy claims we cannot rely on his admissions, the one pound of methamphetamine in his home in January 2016, or the surveillance cameras because the judge did not rely on them. But the judge found Murphy "used his home for storage of large quantities of methamphetamine . . . . on *at least four occasions*." (Supp. R. Vol. 1 at 8-9 (emphasis added).) This finding does not preclude consideration of the one pound of methamphetamine in his home in January 2016. Nevertheless, the judge's failure to explicitly mention any of these items does not preclude us from relying on them. *See United States v. Pulham*, --- F. App'x ---, No. 16-8019, 2018 WL 2374704, at *7-8 (10th Cir. May 24, 2018) (unpublished) (rejecting defendant's argument that we are legally precluded from considering certain facts in the sentencing record because the judge did not make specific findings adopting those facts in applying an enhancement);

---

[11] The judge reasonably inferred the cash was drug proceeds and explicitly considered the items found in his home.

*see also United States v. Underwood*, 938 F.2d 1086, 1091 (10th Cir. 1991) (although "at a minimum, [a] court must make a finding that the requirements for [a guideline] adjustment [such as §2D1.1(b)(1)] have been satisfied," "our cases clearly do not require the . . . court to make particularized findings").  Moreover, all of these findings were contained in the PSR and Murphy did not object to them.[12]  They are therefore deemed admitted.  *See United States v. Walters*, 269 F.3d 1207, 1213 (10th Cir. 2001) ("[U]nder the law of this circuit," when a defendant does "not challenge the accuracy of the relevant facts contained in the PSR . . . they are deemed admitted as true.").[13]

---

[12] At the sentencing hearing, it appears Murphy did attempt to orally contest the PSR's allegation concerning the one pound of methamphetamine.  But the judge did not consider it a contested fact because he did not include it in his written objections; Murphy did not press the matter further.

[13] Murphy also suggests we cannot consider the one pound of methamphetamine in his home in January 2016 because the PSR did not include it in its drug quantity calculations and it is unreliable.  But the PSR's drug quantities were the minimum amounts for which Murphy was responsible.  (Supp. R. Vol. 2 at 6 ("In total, Murphy is accountable for the possession and distribution of *at least* . . . 146.55 grams of methamphetamine.") (emphasis added).)  Notably, the PSR also did not include the 74.65 ounces of heroin found in the November 2015 searches of his residence.

Moreover, Murphy never objected in the district court to the reliability of the source of the information concerning the one pound of methamphetamine.  Our review is for plain error.  Murphy's failure to request plain error review on appeal, either in his opening or reply brief, "'surely marks the end of the road for an argument for reversal not first presented to the district court.'"  *United States v. Lamirand*, 669 F.3d 1091, 1098 n.7 (10th Cir. 2012) (quoting *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011)); *cf. United States v. Courtney*, 816 F.3d 681, 684 (10th Cir. 2016) (reviewing argument for plain error in criminal appeal where appellant "argued plain error fully in his reply brief").  In any event, "in determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial.  Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy."  *See* USSG § 6A1.3 comment.  "Corroborating evidence is often key to determining whether a statement is sufficiently reliable."  *United States v. Ruby*, 706 F.3d

Murphy nevertheless tells us that his admissions are not helpful because he never admitted to dealing drugs from his residence. Similarly, he says the drugs found in his vehicle are irrelevant because they were found in his vehicle, not in his home. But the enhancement applies not only to a defendant's use of a premises for the distribution of a controlled substance, but also to the use of a premises for the "storage of a controlled substance for the purpose of distribution." USSG § 2D1.1(b)(12), comment. (n.17). In that regard, his admissions and the drugs found in his vehicle are telling. Those items, considered in combination with the drugs, proceeds, and tools of the drug trade found in his home, lead to much more than a reasonable inference that he used his home to store drugs for distribution outside his home.

Murphy conveniently admits to being a methamphetamine addict and offers his addiction as an explanation for many of the drugs and associated paraphernalia uncovered in his home or otherwise under his control. He also claims the evidence shows only that he stored drugs at his house for a short period of time. After all, he tells us, only two of the four searches of his residence (the November 3 and November 25, 2015 searches) uncovered distribution quantities of drugs or significant amounts of cash. And those searches occurred within weeks of each other. The next two searches turned up "only piddling amounts." (Appellant's Reply Br. at 7.) But this argument ignores both his

_____

1221, 1229 (10th Cir. 2013). The one pound of methamphetamine officers learned to be in his home is consistent with his admissions that he distributed methamphetamine and would receive it in one pound quantities.

- 16 -

admissions and the large quantity of methamphetamine found in his vehicle in February 2016. Again, a reasonable inference from the evidence is that the drugs in his car and those he admitted to distributing were originally stored in his home. Moreover, the heroin residue and the baggie of heroin found in the third and fourth searches are significant. Although they were not typical distribution quantities, they were not for personal use; Murphy admitted at sentencing that he did not personally use heroin, only methamphetamine. Murphy's storage of drugs occurred for over a year, from November 3, 2015, to November 22, 2016.

He offers innocent explanations for the presence of digital scales, baggies, and surveillance cameras found in his residence. He claims digital scales can be used for personal use and he admitted he was a drug user. Similarly, empty baggies have legitimate purposes. And "just because [he] sometimes used baggies for drugs does not mean that the empty ones . . . were also intended to be used for drugs. [E]ven if they were, the [PSR] does not reveal how many empty baggies were found. Only a lot of baggies would be indicative of drug dealing." (Appellant's Reply Br. at 6.) Finally, he tells us surveillance cameras are not necessarily tools of the drug trade. He says "[m]ethamphetamine users are often paranoid, and Mr. Murphy had been using [methamphetamine] on a daily basis." (Appellant's Op. Br. at 13.)

The Supreme Court has rejected such "divide-and-conquer" approach in evaluating the totality of the circumstances. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) (whether reasonable suspicion exists to support a traffic stop must be based

on the totality of the circumstances; rejecting appellate court's evaluation of disparate facts in isolation from each other in deciding whether reasonable suspicion existed). The relevant question is not whether each fact taken in isolation may have an innocent explanation; rather we look to the facts as a whole to decide whether they support the enhancement. Taken together, digital scales, baggies, and surveillance cameras are "tools of the trade." *Bell*, 766 F.3d at 637; *see also United States v. Taylor*, 813 F.3d 1139, 1144 (8th Cir. 2016). So too are firearms, two of which were present in the residence but which Murphy fails to mention. *Taylor*, 813 F.3d at 1144. And, while all of these items have legitimate purposes, "when [they] are found together in the house of [an admitted] drug dealer, they take on a different hue, providing strong circumstantial evidence that he used the home" for drug-related activity. *Bell*, 766 F.3d at 637. The facts here, taken as a whole, reveal the purpose to which Murphy put these items—illegal drug activity.

Finally, Murphy argues many of the facts we and other circuits have found to support the enhancement are not present here. For instance, in *Henderson*, police officers surveilled the defendant's house for 5-6 months and observed multiple parties entering and exiting his residence in a manner they believed to be consistent with drug-trafficking activity. 604 F. App'x at 656, 658. And a confidential informant made several controlled drug purchases from the defendant at or near his residence. *Id*. In *United States v. Winfield*, an informant bought drugs from the defendant at his residence four times in a twelve week period; each time the informant observed drugs and drug paraphernalia in the home. 846 F.3d 241, 243 (7th Cir. 2018). A subsequent search of

the residence revealed distribution quantities of drugs; the defendant was living off drug proceeds.[14] *Id*.

But "[w]hat is sufficient is not always necessary. That courts have found some facts *sufficient* to establish [that drug-related activity was a primary use of a premise] does not mean that those facts *necessarily* must be shown in every case." *Bell*, 766 F.3d at 637-38 (quotation marks omitted). So too here. The enhancement was warranted in *Henderson* and *Winfield* due to the frequent and substantial drug sales and storage occurring in the defendants' residences. The enhancement in this case was warranted because Murphy's use of his home to store drugs for the purpose of distribution was both frequent and substantial.

**AFFIRMED**.

---

[14] Murphy has not had a job since 2014. So a reasonable inference is that he too was also living off drug proceeds.