**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LUCIO IVAN LOZANO,

    Defendant - Appellant.

No. 18-1031

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CR-00360-RM-1)**
_____

Anna M. Davide, Miami, Florida, for Defendant-Appellant.

Marissa R. Miller, Assistant United States Attorney (Robert C. Troyer, United States Attorney, with her on the brief), Office of the United States Attorney, Denver, Colorado, for Plaintiff-Appellee.
_____

Before **LUCERO**, **SEYMOUR**, and **KELLY**, Circuit Judges.
_____

**SEYMOUR**, Circuit Judge.
_____

Lucio Lozano was charged with involvement in a multi-year cocaine trafficking conspiracy between individuals in Mexico and Colorado. In October 2017, Mr. Lozano pled guilty to conspiracy to distribute and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(ii)(II).

He was subsequently sentenced to 180 months imprisonment and five years supervised release. He challenges the district court's application of two sentencing enhancements: (1) a two-level guidelines increase for maintaining a premise for the purpose of distributing a controlled substance, and (2) a three-level aggravated role enhancement. We affirm.

I.

In his plea agreement, Mr. Lozano stipulated that the conspiracy involved at least 50 kilograms but less than 150 kilograms of cocaine. Based on their analysis of seized notebooks, DEA investigators believed this conspiracy may be responsible for drug transactions involving over six million dollars and 70 kilograms of cocaine. Several co-conspirators are discussed throughout the facts stipulated in the plea agreement but the actors most relevant to the present case are Mr. Keneth Molina-Villalobos and Mr. Jose Lara-Gallegos. DEA agents determined that these two individuals were responsible for the conspiracy's day-to-day operations in Colorado. Both were in contact with Mr. Lozano about matters such as the currency packaged and transferred to load drivers, the status of drivers and cocaine, and records of cocaine sales. Both Mr. Molina-Villalobos and Mr. Lara-Gallegos drove vehicles that were registered to Mr. Lozano. In addition, the stipulated facts include one occasion where Mr. Molina-Villalobos called Mr. Lozano immediately as a load left the Colorado operation, and another occasion where Mr. Lozano texted Mr. Molina-Villalobos to ask if he had finished his assignment.

The stipulation of facts outlines four specific drug transportation and distribution ventures relevant to the conspiracy: (1) the "Lucero Loads," (2) the "Mota Load," (3) the "First Neufeld Load," and (4) the "Second Neufeld Load." These facts are consistent with a regular and reoccurring business enterprise conveying substantial quantities of drugs from Mexico to Colorado. For example, DEA investigators located approximately fifteen kilograms of cocaine in the "Lucero load" that they intercepted in August 2014, and Mr. Lucero admitted he had previously delivered approximately twenty such loads to Colorado, with most of the cocaine going to Mr. Lozano. When DEA investigators followed this lead, they learned that Mr. Lozano had rented a house at 9544 Josephine Street in Thornton, Colorado ("the Josephine house").

The DEA set up pole cameras at the Josephine house and conducted routine surveillance from January to November 2015. During that time, they observed various activities taking place at the house that appeared to be drug-related. Two of the ventures detailed in the stipulation of facts explicitly utilized the Josephine house: the "Mota Load" used the house for a lengthy transaction spanning from January 31 to February 6, 2015, and the "First Neufeld Load" used the house on March 3 and 4, 2015. DEA agents concluded that both transactions used the Josephine house to unload drugs from couriers' cars and to fill them with bulk currency. Mr. Molina-Villalobos confirmed this conclusion in a post-arrest interview, admitting that he used the Josephine house to "take bricks out of cars [he] received from various people." Aplt. App. at 33–34.

3

Although the lease for the Josephine house was in Mr. Lozano's name and he was responsible for paying the utilities, DEA surveillance determined that he did not live in the house consistently. He lived in Mexico for the first six months of surveillance, he returned to live in the Josephine house from mid-June to early November 2015, and he was seen transporting personal items from the house to a storage unit that November. Mr. Lara-Gallegos lived in the Josephine house during the periods that Mr. Lozano lived in Mexico. Mr. Lara-Gallegos later moved to 2191 Carrol Court, in Thornton, Colorado. A search warrant was never issued for the Josephine house and a warranted search of Mr. Lozano's storage unit uncovered only personal items. But a March 2016 warrant executed on Mr. Lara-Gallegos' subsequent residence at 2191 Carrol Court revealed various tools of the trade, including a kilogram press and a kilogram stamp, money packaging materials, scales, mixing bowls with white residue, a vacuum sealer, and three notebooks that detailed a litany of transactions. These notebooks recorded Mr. Lozano as making over $200,000 from just fourteen individual transactions.

Mr. Lozano pled guilty but he objected to the two sentencing enhancements recommended in the plea agreement and presentence report. With respect to the two-level enhancement for maintaining a premise, Mr. Lozano argued that Mr. Lara-Gallegos was the individual in control of the Josephine house during the time it was used for the drug trafficking activity described in the stipulation of facts, that the house was not used primarily for drug distribution but only as a residence, and that he allowed his co-conspirator to live in the house not for the purpose of enabling drug

4

activity but because of Mr. Lara-Gallegos' familial connection to him as well as Mr. Lara-Gallegos' undocumented status. The government countered that the stipulated facts suggest the activity occurring at the house actually exceeded the two specific ventures outlined. It also argued that the magnitude of the loads being trafficked through the house showed the large-scale nature of the drug-trafficking activity, and therefore a constant flow of people through the house was not required.

With respect to the three-level aggravated role enhancement, Mr. Lozano argued that his role as a middleman in the conspiracy did not compel the conclusion that he managed any of his co-conspirators, that his provision of means to Mr. Molina-Villalobos and Mr. Lara-Gallegos was not because of a managerial role over them but because of their undocumented status, and that he operated within his own "box" in the conspiracy and only exercised control relative to that restricted box. In response, the government emphasized Mr. Lozano's instruction to and the accountability of Mr. Molina-Villalobos and Mr. Lara-Gallegos, and his superior knowledge of both the south and north end of the trafficking activity. The government further argued that Mr. Lozano provided the means to his co-conspirators to enable their drug-related activities, and that he regularly received payouts exceeding those of his co-conspirators because of his oversight and control over the Colorado drug-trafficking activities.

At sentencing, the district court overruled both objections and increased the defendant's offense level accordingly. Mr. Lozano appeals, contending the district court clearly erred in the application of both sentencing enhancements. We disagree.

5

## II.

The district court's factual findings are reviewed for clear error, while its legal conclusions are reviewed de novo. *United States v. Eaton*, 260 F.3d 1232, 1237 (10th Cir. 2001). Factual findings are clearly erroneous only if they are without factual support in the record or if this court, considering all the evidence, is left with a definite and firm conviction that a mistake has been made. *United States v. Zar*, 790 F.3d 1036, 1046 (10th Cir. 2015). The evidence is viewed in the light most favorable to the government. *Id.*

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985). We afford "great deference to the district court's application of the Guidelines to the facts." *Eaton*, 260 F.3d at 1237.

### A. The "Stash-House" Enhancement

Mr. Lozano first argues that the district court erred in applying a two-level sentencing enhancement under U.S.S.G. § 2D1.1(b)(12), which increases a defendant's base offense level two points if he "maintained a premise for the purpose of manufacturing or distributing a controlled substance." The government must prove this by a preponderance of the evidence. *See, e.g.*, *United States v. Gambino-Zavala*, 539 F.3d 1221, 1228 (10th Cir. 2008). Both parties agree that the evidence here concerns only drug distribution (not manufacturing). The commentary to §

6

2D1.1(b)(12), which is authoritative, explains that "distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." § 2D1.1, cmt. n.17; *see also United States v. Murphy*, 901 F.3d 1185, 1190 (10th Cir. 2018). This determination of "primary" use requires consideration of the frequencies of the lawful and unlawful activity at the premises. § 2D1.1, cmt. n.17; *see Murphy*, 901 F.3d at 1191.

> And the frequent/substantial metric is a reciprocal sliding scale. A substantial drug distribution that regularly and quickly passes through the home (two or three days) on a bi-monthly or tri-monthly basis may qualify as a primary use of the premises for drug-related purposes much the same as an exquisitely frequent, but relatively paltry, operation.

*Id.* In the same way that a residence is considered to be a home 100% of the time even when not occupied 100% of the time, a home may be used for the primary purpose of unlawful drug activity even when such activity is not constant. *Id.* The analysis comes down to a 'totality of the circumstances' evaluation, which includes:

> (1) the frequency and number of drugs sales occurring at the home; (2) the quantities of drugs bought, sold, manufactured, or stored in the home; (3) whether drug proceeds, employees, customers, and tools of the drug trade (firearms, digital scales, laboratory equipment, and packaging materials) are present in the home, and (4) the significance of the premises to the drug venture.

*Id.* at 1191–92. The facts found to be sufficient to support an enhancement in one case may not be necessary to support that enhancement in other cases. *See id.* at 1195.

The district court explained that Mr. Lozano had no reason to finance the Josephine house other than for facilitation of the drug-distribution network. Although Mr. Lozano leased and paid the utilities at the Josephine house, the court found that it was not Mr. Lozano's living place. In so doing, the court noted that "[w]ith respect to the presentence report, as well as the [] bail report, there are addresses listed that he lives at, where his wife lives, where his family lives. This place doesn't show up as among that list." Aplt. Aplt. App. at 115. The court rejected as unsupported Mr. Lozano's proffered explanation of using the house to charitably host relatives, noting that "[h]e is not, drugs aside, a wealthy man. There's no reason to believe that he is using this as a familial house." *Id*. at 86. Accordingly, the district court found that Mr. Lozano could have no logical primary interest for the house "other than a place where these drug loads [were] brought, unloaded, replaced with money and moved on." *Id.* at 85–86.

Mr. Lozano challenges these factual findings on appeal. He argues that the premises were not maintained by him but by Mr. Lara-Gallegos, and that other facts such as the lack of drug paraphernalia found in Mr. Lozano's storage unit plus his familial relationship with Mr. Lara-Gallegos compel the conclusion that he was primarily using the house as a home and not for drug distribution. But the district court's factual findings are supported by the record, and Mr. Lozano's presentation of different facts as forming a different view of the evidence cannot undermine the district court's plausible account. First, as the government aptly notes on appeal, a defendant's day-to-day control of a property is only one part of the inquiry as to

8

whether he maintained that property. *See* § 2D1.1, cmt. n.17. This comment to § 2D1.1 first asks whether the defendant owned or rented the place, which Mr. Lozano unquestionably did. The inquiry also includes "the extent to which the defendant controlled access to" the premises; here, Mr. Lozano controlled who resided in the house in his absence (Mr. Lara-Gallegos) and he provided vehicles enabling access to and from the premises to both this resident and Mr. Molina-Villalobos, a regular visitor. *Id.* The record supports the district court's finding that Mr. Lozano "maintained" the premises.

Second, the district court properly looked to both the size and scope of Mr. Lozano's use of the house for cocaine distribution in determining that this was a primary use. *See Murphy*, 901 F.3d at 1192 ("But looking to both the size and the scope of the drug-related use of the home . . . ensures the enhancement will not apply when that use is truly 'incidental.'"). Employing logic analogous to the sliding scale described in *Murphy*, the district court recognized that in the same way a constant flow of people through the house to pick up paltry quantities of drugs is consistent with a primary use for distribution, so is fewer uses of the house that are individually greater in magnitude. Considering the scale of the drug loads being moved through the house, the court explained that "you have to look at, kind of, the nature of the enterprise that we're talking about. What we're talking about is multiple kilogram loads, very large. We're not talking about retail sales and retail distribution." Aplt. App. 82.

9

Moreover, the district court found that the frequency of the transactions using the house likewise supported the application of the sentencing enhancement. It inferred that these transactions were more numerous than the two specifically outlined, supporting this inference by citing stipulated facts such as Mr. Molina-Villalobos's statements about the house receiving drug shipments from "various" people, which the court interpreted as meaning "more than two." *Id.* at 86; *see also id.* at 83–84 ("[T]here's no suggestion, no reasonable interpretation of these facts, that suggests that there was drug activity, and then it, for some reason, stopped during the entirety of the time of the Josephine house ownership . . . . That's not consistent with the recurring nature of the loads.").

The court explained that it was looking at the totality of the circumstances, stating that "I take [the facts] as a picture, and what that picture says is, recurring use of that house . . . ." *Id.* at 86. Based on all of the circumstances, the court found it more likely than not that Mr. Lozano maintained the residence for the purpose of distributing cocaine. Given the evidence discussed above, we cannot say that the district court clearly erred in so finding.

B. The Aggravated Role Enhancement

Mr. Lozano next contends that the record does not support a three-level sentencing enhancement under U.S.S.G. § 3B1.1(b), which applies if the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants. *Id.* Mr. Lozano need only manage or supervise *one* of his co-conspirators to qualify for the three-level enhancement. *See, e.g.,*

10

*United States v. Gonzales Edeza*, 359 F.3d 1246, 1248 (10th Cir. 2004). "[T]he term 'supervisor' [is] satisfied upon a showing that the defendant exercised *any* degree of direction or control over someone subordinate to him." *United States v. Backas*, 901 F.2d 1528, 1530 (10th Cr. 1990) (emphasis added); *see also id.* ("In order to be a supervisor, one needs merely to give some form of direction or supervision to someone subordinate in the criminal activity . . . .").

Once again, the district court here looked at the whole picture to find that Mr. Lozano was a manager or supervisor of some members of the conspiracy, specifically Mr. Lara-Gallegos and Mr. Molina-Villalobos. In reaching this conclusion, the court reviewed the list of considerations included in the Guidelines' commentary. The court focused most heavily on Mr. Lozano's exercise of decision-making authority over these co-conspirators, including provision of the means that enabled their trafficking activities, and his routine claim to a larger share of the profits despite his lack of on-the-ground involvement. It found that "[t]here are all of the indications that he has the ability to exercise decision-making authority. People report to him. They report about drugs. They report about money. They are not doing that for no reason." Aplt. App. at 119. The court discarded alternate explanations for the communications that occurred between Mr. Lozano and his co-conspirators, reasoning that

> he is providing means, and . . . when you look at this, and they are reporting to him [] you can say, *Well, it doesn't mean in isolation that he is the boss*. But when they report numbers up to him, and he corrects them, *Uh-huh, buddy*. When they report problems to him, all of these things are signs of somebody who is the boss. Not just somebody who you call, because he is a consultant to the drug organization. And you are asking him, *Hey, how do I get this fixed*? Or, *What would you do if*? I suppose that's a possible interpretation, but it is

11

hardly a probable one, and certainly not one found by me by a preponderance of the evidence.

*Id*. at 118. Assessing the complete picture created by the evidence, the district court reasoned:

> If you are controlling the dope and you are controlling the home and you are controlling the cars[,] and the people that are doing the low-level grunt work of the organization . . . are family members that are dependent upon you for transportation, for housing, you are in control.

*Id*. at 121. The court further found that Mr. Lozano received a larger share in the fruits of the crime, noting that the ledgers found by DEA agents listed Lozano as consistently collecting a sizeable cut of the profits—a larger share than anyone else on the Colorado side of the conspiracy. As the government highlighted, these are substantial payoffs "for someone who doesn't show his face on pole cameras. . . . He is not the one driving around town having to pick up load drivers, yet he gets big payouts, and that's because he is in charge." *Id*. at 107.

Based on these facts and corresponding inferences, the district court found by a preponderance of the evidence that Mr. Lozano exercised some degree of control over individuals subordinate to him. Mr. Lozano contends again on appeal that he is a mere middleman who did not manage or supervise any other individuals, submitting that although at times he would direct other individuals to complete tasks unrelated to the conspiracy, he never directed or ordered them to do anything in furtherance of the conspiracy. He relies heavily on the district of New Mexico's decision in *United States v. Cervantes-Chavez*, 59 F. Supp. 3d 1295, 1324 (D.N.M. 2014), arguing that he too purchased and sold drugs in arms-length or quasi-arms-length transactions but

12

did not supervise or manage any of the individuals to which he sold drugs. In that case, however, "no single, identifiable individual ha[d] been proposed to the Court as someone whom Cervantes-Chavez organize[d], le[d], manage[d], or supervise[d]." *Id.* at 1324. In contrast, the government here identified two specific individuals who were supervised by Mr. Lozano and provided factual support regarding each of them. Moreover, our standard for reviewing the evidence is different from that of the district court in *Cervantes-Chavez*, and Mr. Lozano's ability to proffer a reasonable alternate view of the evidence is not sufficient to undermine the district court's factual findings. At the sentencing hearing, the government cited to numerous specific examples in the record of Mr. Lozano's control over his co-conspirators, and the district court was not clearly erroneous in relying on these examples to infer Mr. Lozano's role as a supervisor or manager. Nor was it clearly erroneous in choosing the government's proffered explanations for these specific examples over Mr. Lozano's.

Furthermore, even some of Mr. Lozano's own statements acknowledge the district court's view of the evidence as valid. For instance, he argued during the sentencing hearing that both his and the government's proffered explanations for why he provided his coconspirators with means were reasonable. On appeal he argues that his own depiction of his role in the conspiracy is "just as likely" as the explanation offered by the government and accepted by the district court. Aplt. Br. at 23. But these equivalencies are not sufficient to meet the clearly erroneous standard

13

of review, under which we must affirm the district court's account of the evidence if it is plausible in light of the record as a whole. *See Anderson*, 470 U.S. at 573–74.

The district court's factual findings are supported by the record, and we therefore affirm.