PUBLISH

UNITED STATES COURT OF APPEALS

TENST CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

EDGAR RENE MIER-GARCES,

Defendant-Appellant.

No. 18-1085

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CR-00360-RM-2)

Robert T. Fishman, Ridley, McGreevy & Winocur, PC, Denver, Colorado, for
Defendant-Appellant.

Karl L. Schock, Assistant United States Attorney (Jason R. Dunn, United States
Attorney, with him on the briefs), Office of the United States Attorney, Denver,
Colorado, for Plaintiff-Appellee.

Before **BRISCOE**, **HOLMES**, and **McHUGH**, Circuit Judges.

**HOLMES**, Circuit Judge.

Edgar Rene Mier-Garces was separately charged with conspiracy to

distribute controlled substances, in violation of 21 U.S.C. § 846, in both the

Western District of Texas and the District of Colorado. After pleading guilty in the Western District of Texas, Mr. Mier-Garces argued that the District of Colorado indictment violated his rights under the Fifth Amendment's Double Jeopardy Clause. The district court denied his motion to dismiss. Mr. Mier-Garces was subsequently convicted and sentenced to 178 months' imprisonment. On appeal, he challenges the district court's Double Jeopardy Clause ruling and argues that the district court erroneously calculated his advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range by applying an enhancement under § 2D1.1(b)(12). Exercising jurisdiction under 28 U.S.C. § 1291, we conclude the court did not err in either ruling and **affirm** its judgment.

**I**

**A**

Mr. Mier-Garces worked on the Mexican-American border as a "gatekeeper" for a Mexican drug trafficker known as "El Muñeco." R., Vol. II, at 71 (Report of Investigation, dated Nov. 30, 2015). Generally, in his gatekeeper role, Mr. Mier-Garces assisted in smuggling narcotics into the United States from Ciudad Juarez, Mexico and then smuggling bulk currency back into Mexico from the United States. Mr. Mier-Garces's role focused on receiving and loading vehicles for couriers. Mr. Mier-Garces would retrieve these vehicles from public locations in the El Paso, Texas metro area and take them back to his residence in

2

Chaparral, New Mexico where he would load narcotics into hidden, after-market compartments that had been built into the vehicles. He would return the drug-laden vehicles to the couriers, who in turn would distribute the narcotics to destinations throughout the United States—including, as relevant here, Albuquerque, New Mexico, and Denver, Colorado. The couriers would then return the cash proceeds, secreted in the vehicles, to El Paso, where Mr. Mier-Garces would retrieve the vehicles, unload the cash, and ensure that the cash was transported back to El Muñeco in Mexico. Approximately once every two weeks, Mr. Mier-Garces loaded vehicles with narcotics. Mr. Mier-Garces stored any excess currency and drugs in a safe at his Chaparral residence.

As a result of Mr. Mier-Garces's gatekeeper activities, he was indicted for participating in drug-trafficking conspiracies in the District of Colorado and the Western District of Texas. Below, we summarize the factual circumstances relating to those indictments and the particulars of those indictments.

**1**

In addition to Mr. Mier-Garces, there were six other named conspirators in the conspiracy charged in the District of Colorado ("Colorado conspiracy"), including Lucio Lozano and Martha Mota. Although not charged by name along with Mr. Mier-Garces, the following individuals were also participants in the Colorado conspiracy: Franz Neufeld-Reimer, Helena Wieler de Neufeld, and Jack

3

Lucero.

On August 15, 2014, Mr. Lucero was stopped by police while driving an SUV in New Mexico. The trooper found multiple bricks of cocaine in his car. A subsequent search of his car revealed hotel receipts connecting Mr. Lucero to an individual named Mr. Lozano, who was based in the Denver, Colorado area. Investigators began surveillance of Mr. Lozano's residence in the Denver area. Surveillance of this house, in turn, led investigators to other individuals who were either distributing cocaine in the Denver area or who were also trafficking narcotics and currency between El Paso and Denver. One of these couriers, Ms. Mota, was arrested on February 5, 2015, while she was returning from Denver to El Paso with bulk currency. Two other couriers, Mr. Neufeld-Reimer and Ms. Wieler de Neufeld, were seen twice in March 2015 transporting narcotics between El Paso and Denver. Like other couriers, they would drop off their vehicle in public locations in the El Paso area, where an individual would take their vehicle for several hours and then return the vehicle to them for the drive. Mr. Mier-Garces admitted loading narcotics on at least two occasions into the vehicles of Ms. Mota, Mr. Neufeld-Reimer (with Ms. Wieler de Neufeld present for the loading), and Mr. Lucero.

Mr. Mier-Garces was indicted on September 3, 2015 in the District of Colorado. A superseding indictment was issued on May 2, 2016. This indictment

4

charged the offenses at issue here. Namely, the superseding indictment charged Mr. Mier-Garces and "others both known and unknown," including Mr. Lozano and Ms. Mota, with "knowingly and intentionally conspir[ing] to distribute, and possess[ing] with the intent to distribute, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine" in violation of 21 U.S.C. § 846. *Id.*, Vol. I, at 70–71 (Superseding Indictment, filed May 2, 2016). The conspiracy was alleged to have run from December 8, 2013 until March 22, 2016.

**2**

Mr. Mier-Garces also was indicted for participating in a drug-trafficking conspiracy in the Western District of Texas ("Texas conspiracy"). Specifically, while the transportation of drugs to Denver was occurring, on March 8, 2015, Mr. Mier-Garces asked a confidential informant to transport cocaine from El Paso to Albuquerque. Mr. Mier-Garces took a vehicle from that confidential informant, loaded it with 10.6 kilograms of cocaine at his Chaparral residence, and returned it to the informant believing that the informant would drive the vehicle to Albuquerque. The confidential informant, however, coordinated with federal agents who later conducted a controlled delivery of the vehicle in Albuquerque to individuals who believed the vehicle contained drugs; they were subsequently arrested.

As a result of his participation in this El Paso-to-Albuquerque movement of

cocaine, Mr. Mier-Garces was indicted on September 2, 2015 in the Western District of Texas. A superseding indictment was issued on November 10, 2015. The superseding indictment charged Mr. Mier-Garces with conspiring "with others to the Grand Jury known and unknown" to possess with intent to distribute "5 kilograms or more of a mixture or substance containing a detectable amount of cocaine" in violation of 21 U.S.C. § 846. *Id.*, Vol. II, at 66–67 (Superseding Indictment, filed Nov. 10, 2015). The period of the charged conspiracy was only one day, March 8, 2015. In this superseding indictment, Mr. Mier-Garces also was separately charged with participating in a conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(a)(2)(B)(ii), (h). Besides Mr. Mier-Garces, no other co-conspirators were named in the Texas indictment.

**B**

As Mr. Mier-Garces was seeking to reenter the United States from Mexico on November 18, 2015, he was arrested on a warrant that had been issued based on the Texas indictment. At a post-arrest interview with agents from both the Western District of Texas and the District of Colorado, Mr. Mier-Garces explained his role in the drug-trafficking operation, as summarized above. He also agreed to allow agents to search his home. The search of his home did not result in the discovery of any drugs but did reveal various pieces of evidence consistent with his description of his role, e.g., a safe used to store narcotics and

6

bulk currency. While an agent involved with the District of Colorado indictment was present during this interview (alongside the agents from the Western District of Texas), Mr. Mier-Garces was not informed about the Colorado indictment. On December 8, 2015, Mr. Mier-Garces participated in another debriefing where he again discussed his role in the drug-trafficking operation. The agent involved in the Colorado case was not present for that debriefing, but did receive a report about it later. Though the agents from Texas and Colorado coordinated, they purportedly worked to "de-conflict" so as to "keep [their] cases separate" throughout the investigation. *Id.*, Vol. III, at 191 (Tr. of Mots. Hr'g, dated May 26, 2017).

Mr. Mier-Garces subsequently pleaded guilty to the charges in the Texas indictment, including the drug-conspiracy charge, and was sentenced to fifty-seven months' imprisonment. Notably, the only drug quantity attributed to Mr. Mier-Garces at sentencing was the 10.6 kilograms; that is, there was no finding that additional drugs were involved in the conspiracy charged in the Texas indictment.

After he pleaded guilty to the Texas charges, Mr. Mier-Garces filed a motion to dismiss the Colorado indictment on the ground that it violated his rights under the Double Jeopardy Clause. The district court held an evidentiary hearing on the motion, largely establishing the information that we have summarized

7

above. The government additionally presented evidence that none of the anonymous co-conspirators from the Texas indictment were members of the conspiracy charged in the Colorado indictment, and that the Colorado grand jury did not hear any evidence concerning loads of narcotics going anywhere other than Colorado; more specifically, the grand jury received no evidence regarding the 10.6-kilogram load that went to Albuquerque.

At the hearing, the court listened to testimony from a prosecutor and an agent from the Western District of Texas, an agent from Colorado, and an investigator from the Federal Public Defender's Office in the Western District of Texas. Both defense counsel and the government offered oral argument.

The court ruled that Mr. Mier-Garces had failed to carry his burden of demonstrating that the Texas and Colorado conspiracies were in fact one conspiracy. The court noted "that the evidence on that issue [i.e., whether there was in fact one conspiracy] is little, and what little there is, is inadequate." *Id.* at 512 (Tr. of Oral Ruling, dated June 6, 2017). While the court noted the geographic overlap of the conspiracies, it did not find that overlap determinative. The court agreed with defense counsel that it was "arguably unusual . . . to see limited one-day conspiracies," as charged in the Texas indictment, but said that this "does not answer the question whether or not the two [conspiracies] are the same." *Id.* at 513. The court noted the potential difficulty raised by the Texas

8

indictment's failure to name co-conspirators but did not think this absence demonstrated "that we're dealing with one rather than two conspiracies," because, other than the possible exception of El Muñeco, there was no evidence that the conspiracies shared co-conspirators. *Id.* at 513–14. The court observed that the drugs destined for Albuquerque were not mentioned to the Colorado grand jury. Finally, the court noted that the interdependence of the conspiracies was a factor that "the Tenth Circuit may think is particularly important," but it was one "that neither side ha[d] really addressed." *Id.* at 516–17. "What I have is no evidence on interdependence being present or absent. As I said, it's not been raised." *Id.* at 517. Thus, the court denied the motion. Mr. Mier-Garces subsequently went to trial and was convicted. He did not renew his double-jeopardy motion during or after the trial.

## C

After Mr. Mier-Garces was convicted, the United States Probation Office prepared a Presentence Investigation Report ("PSR") for his sentencing.[1] The PSR included a two-level enhancement under Guidelines § 2D1.1(b)(12) for Mr. Mier-Garces's maintenance of his residence for the purpose of distributing a controlled substance. Mr. Mier-Garces objected to this enhancement. The district

---

[1] The Probation Office used the 2016 edition of the Guidelines in preparing the PSR. This decision is not challenged here, and we accordingly use that edition in evaluating the issues in this appeal.

court overruled Mr. Mier-Garces's objection, finding that the primary purpose of the property was the storage or distribution of drugs. That finding was based on the court's subsidiary findings that "there's no question that the way this worked is drugs came up from Mexico, [and] they were stored [at the house] until they were transferred up to other parts of the United States." *Id.*, Vol. IV, at 934 (Tr. of Sentencing Hr'g, dated Mar. 2, 2018). The court relied on pictures of Mr. Mier-Garces's home that purportedly demonstrated his home was "a place that . . . a person does not really live in." *Id.* at 935. The pictures revealed that there was "no furniture," no refrigerator, "no stove," "stuff thrown all over the floors," and, generally, "a mess" that made the home "not usable." *Id.* The court additionally relied on Mr. Mier-Garces's statements that "he was moving drugs . . . at least twice a month, which is a repetitive, continuing use of that property to store, load, unload cars, store drugs and money, unload and load cars," and that "he doesn't take mail at that address." *Id.* at 936. Because "it looks like no one stays there with any regularity" and "there is repetitive drug activity coming off of that property," the court found the evidence "tips, by a preponderance, in favor of the [§ 2D1.1(b)(12)] adjustment." *Id.* Mr. Mier-Garces was sentenced to 178 months' imprisonment, to run consecutively to the Western District of Texas sentence. Mr. Mier-Garces timely appealed.

10

## II

Mr. Mier-Garces first argues that the district court erred in its Double Jeopardy Clause ruling. We set out our standard of review and the appropriate substantive standards before applying those standards to the relevant facts. We properly consider only the factual record that was before the district court at the time that it ruled on the motion to dismiss because Mr. Mier-Garces did not renew his motion during or after trial.[2] *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 648 (10th Cir. 2008) ("We generally limit our review on appeal to the record that was before the district court when it made its decision . . . ."); *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1019 (10th Cir. 2004) ("[W]e may only 'evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight.'" (quoting *Old Chief v. United States*, 519 U.S. 172, 182 n.6 (1997)); *see also Theriot v. Par. of Jefferson*, 185 F.3d 477, 491 n.26 (5th Cir. 1999) (explaining that appellate courts "may not consider facts which were not before the district court at the time of the challenged ruling").

We conclude that the district court did not clearly err in finding that the Colorado conspiracy and the Texas conspiracy were in fact separate conspiracies

---

[2] Mr. Mier-Garces (through counsel) indicated at the hearing that he had planned to renew the double-jeopardy motion but he ultimately did not do so. *See* R., Vol. III, at 485 ("Well, I submit until jeopardy attaches, by selecting the jury in this case, I will be renewing that motion, and we will see what the government's evidence is at trial.").

(i.e., not a single conspiracy). Accordingly, the court did not err in denying Mr. Mier-Garces's double-jeopardy motion.

**A**

"We review the factual findings underlying the defendant's double jeopardy claim for clear error." *United States v. Leal*, 921 F.3d 951, 958 (10th Cir. 2019) (quoting *United States v. Rodriguez-Aguirre*, 73 F.3d 1023, 1024–25 (10th Cir. 1996)); *accord United States v. Mintz*, 16 F.3d 1101, 1104 (10th Cir. 1994). More specifically, a district court's findings concerning whether a defendant was involved in a "single, continuing conspiracy," *United States v. Beachner Constr. Co.*, 729 F.2d 1278, 1281 (10th Cir. 1984), or, alternatively, involved in "separate and distinct conspiracies," *United States v. Jones*, 816 F.2d 1483, 1486 (10th Cir. 1987), are factual in nature, and thus are reviewed for clear error, *see id.* (holding that whether offenses involved "separate and distinct conspiracies" was "essentially a finding of fact, and we therefore review it under the clearly erroneous standard"); *Beachner*, 729 F.2d at 1281 ("The standard we must apply in reviewing the district court's finding of a 'single, continuing conspiracy' is whether it was 'clearly erroneous.'" (quoting *United States v. Jabara*, 644 F.2d 574, 577 (6th Cir. 1981))).[3] Notably, as amplified below, the issue of

---

[3] In his discussion of the appropriate standard of review, Mr. Mier-Garces cites out-of-circuit authority that treats the question of whether the

(continued...)

12

interdependence—which is the key to resolving the question of whether there is one or more conspiracies—is a factual finding that we review "for clear error." *Leal*, 921 F.3d at 958. "The district court's ultimate determination regarding double jeopardy is, however, a question of law we review de novo." *Id.* (quoting *Rodriguez-Aguirre*, 73 F.3d at 1025).

**B**

We turn now to the substantive legal standards that apply to Mr. Mier-Garces's double-jeopardy arguments. After providing a brief overview of the Double Jeopardy Clause, we explain that under our precedent—in order to discern whether separately charged conspiracies are in fact one—the central and determinative question is whether those conspiracies are interdependent. And, by way of preview of our subsequent analysis, we ultimately conclude, like the district court, that Mr. Mier-Garces's showing of interdependence was inadequate to sustain his double-jeopardy challenge.

**1**

---

[3](...continued) defendant has been prosecuted in violation of the Double Jeopardy Clause for one conspiracy—where there were actually two charged conspiracies—as a matter warranting de novo review. *See United States v. Sertich*, 95 F.3d 520, 524 (7th Cir. 1996) (noting that the court reviews "the [district] court's ruling based on all the evidence available to it to determine, *de novo*, whether the preponderance of the evidence points to two conspiracies or only one"). Suffice it to say, we must adhere to our own precedent on this point.

The Double Jeopardy Clause states that no person shall "be subject for the same offence to be twice put in jeopardy." U.S. CONST. amend. V. "[A]t its core, the Clause means that those acquitted or convicted of a particular 'offence' cannot be tried a second time for the same 'offence.'" *Gamble v. United States*, --- U.S. ----, 139 S. Ct. 1960, 1964 (2019). "This guarantee recognizes the vast power of the sovereign, the ordeal of a criminal trial, and the injustice our criminal justice system would invite if prosecutors could treat trials as dress rehearsals until they secure the convictions they seek." *Currier v. Virginia*, --- U.S. ----, 138 S. Ct. 2144, 2149 (2018).

The Double Jeopardy Clause's guarantee includes different types of protections. *See United States v. Dixon*, 509 U.S. 688, 696 (1993) ("This protection applies both to successive punishments and to successive prosecutions for the same criminal offense."); *Leal*, 921 F.3d at 959 ("It provides three protections. 'It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.'" (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).

"When the government charges a defendant under *separate statutes* for the same conduct, the test derived from *Blockburger v. United States*, 284 U.S. 299 (1932), determines whether the crimes are the 'same offense' for double jeopardy

14

purposes" and thus whether the Double Jeopardy Clause was violated. *Leal*, 921 F.3d at 960 (emphasis added); *see Blockburger*, 284 U.S. at 304 ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."); *accord United States v. 9844 S. Titan Court*, 75 F.3d 1470, 1488 (10th Cir. 1996).

In other words, *Blockburger*'s so-called "same-elements test . . . inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." *Dixon*, 509 U.S. at 696; *see* Akhil Reed Amar, *Double Jeopardy Law Made Simple*, 106 YALE L.J. 1807, 1813 (1997) ("*Blockburger* treats two offenses as different if and only if each requires an element the other does not."). The *Blockburger* test involves a legal analysis focused on the elements of the separate statutes. *See, e.g.*, *United States v. Cardall*, 885 F.2d 656, 665 (10th Cir. 1989) (rejecting the defendant's "claim that the focus of the double jeopardy analysis [under *Blockburger*] is *conduct*, not the legal elements of the offense"); *United States v. Davis*, 793 F.2d 246, 248 (10th Cir. 1986) ("The double jeopardy test does not focus on the acts charged in the indictment or the evidence at trial, but rather on the elements of the crimes."); *see also United States v. Angilau*, 717 F.3d 781, 787 (10th Cir. 2013) ("In assessing whether the

15

crimes require proof of different facts, we do 'not focus on the acts charged in the indictment . . . but rather on the elements of the crimes.'" (omission in original) (quoting *Davis*, 793 F.2d at 248)).

But, as most relevant here, the Double Jeopardy Clause also provides a distinct protection for defendants who have been charged with violating the *same statute* more than one time when they have in fact only violated it once. *See Sanabria v. United States*, 437 U.S. 54, 70 n.24 (1978) ("Because only a single violation of a single statute is at issue here, we do not analyze this case under the so-called 'same evidence' test [i.e., the same-elements test of *Blockburger*], which is frequently used to determine whether a single transaction may give rise to separate prosecutions, convictions, and/or punishments under separate statutes."); *United States v. Rigas*, 605 F.3d 194, 204 (3d Cir. 2010) (en banc) ("The *Blockburger* test is a tool for determining whether Congress intended to separately punish violations of distinct statutory provisions, and is therefore inapplicable where a single statutory provision was violated."); *United States v. Asher*, 96 F.3d 270, 273 (7th Cir. 1996) ("[B]y its very terms the *Blockburger* test applies only where 'the same act or transaction constitutes a violation of two distinct statutory provisions'[.]" (quoting *Blockburger*, 284 U.S. at 304)).

More specifically in the conspiracy context, "[w]hen the government charges a defendant with committing two (or more) conspiracies [involving the

16

same conspiracy statute], whether the charges are for the 'same offense' depends on whether they 'are *in fact* based on a defendant's participation in a single conspiracy.' If so, double jeopardy 'bars the second prosecution.'" *Leal*, 921 F.3d at 960 (emphasis added) (quoting *United States v. Daniels*, 857 F.2d 1392, 1393 (10th Cir. 1988)); *accord Daniels*, 857 F.2d at 1394 (noting, in the context of two indictments charging conspiracy to manufacture methamphetamine, that the defendant must prove "the two offenses contained in the two indictments are the same offense both in law and *fact*" (emphasis added)); *see United States v. Sasser*, 974 F.2d 1544, 1550 (10th Cir. 1992) ("We have held that 'if two charges of conspiracy are in fact based on a defendant's participation in a single conspiracy, the former jeopardy clause bars the second prosecution.'" (quoting *Daniels*, 857 F.2d at 1393)); *Wilkett v. United States*, 655 F.2d 1007, 1014 (10th Cir. 1981) ("If two charges of conspiracy are in fact based on a defendant's participation in a single conspiracy, the former jeopardy clause bars the second prosecution.").

Accordingly, in this context, where the defendant is separately charged with two (or more) conspiracy offenses under the same conspiracy statute, the double-jeopardy analysis is centered on the factual question of whether the charged conspiracies are actually in fact one. *See, e.g.*, *Beachner*, 729 F.2d at 1281; *cf.* Amar, *supra*, at 1817 ("[U]nder the Double Jeopardy Clause, an offense must not

17

only be the same in law—it must also be the same in fact. Even if [the defendant] is convicted of robbery in an earlier trial, he may later be charged with and tried for robbery so long as the second indictment concerns a factually different robbery—committed, say, on a different day against a different victim.").

**2**

We recently addressed a double-jeopardy challenge in a very similar setting involving two drug-trafficking conspiracy prosecutions brought under 21 U.S.C. § 846. *See Leal*, 921 F.3d at 957. *Leal* has helpfully synthesized and clarified our precedent as it applies to circumstances such as these. *See id.* at 959–61. For reasons we elaborate on in Part II.B.3 below, we are generally guided by its framework here.

In the double-jeopardy context,

> [w]hen, as here, a defendant claims that a second conspiracy charge is for the same conspiracy as the first conspiracy charge[,] . . . "the court must determine whether the two transactions [alleged in the charges] were interdependent and whether the [co-conspirators] were 'united in a common unlawful goal or purpose.'"

*Id.* at 960 (third and fourth alterations in original) (quoting *Mintz*, 16 F.3d at 1104); *accord Sasser*, 974 F.2d at 1550. More specifically, "[o]f principal concern is whether the conduct of the alleged co-conspirators, however diverse and far-ranging, exhibits an interdependence." *United States v. Daily*, 921 F.2d 994, 1007 (10th Cir. 1990), *overruled on other grounds by United States v.*

18

*Gaudin*, 515 U.S. 506 (1995); *accord Leal*, 921 F.3d at 960; *Sasser*, 974 F.2d at 1550. And "the focal point of the analysis" for determining whether two charged conspiracies are interdependent is the inquiry into whether they are "united in a common unlawful goal or purpose." *Daily*, 921 F.2d at 1007; *accord Sasser*, 974 F.2d at 1550.

A "common goal, however, is not by itself enough to establish interdependence: 'What is required is a *shared*, single criminal objective, not just similar or parallel objectives between similarly situated people.'" *United States v. Carnagie*, 533 F.3d 1231, 1239 (10th Cir. 2008) (quoting *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992)); *see id.* (noting that although the two separate groups alleged to be joined in one conspiracy "had the same general objective—to profit from submitting fraudulent FHA loans—it does not necessarily mean that the separate groups were interdependent"). "Conspiracies aimed at different ends are not interdependent." *Leal*, 921 F.3d at 961.

"A shared objective is present when 'the activities of [the] alleged co-conspirators in one aspect of the charged scheme were necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole.'" *Id.* at 960 (alteration in original) (quoting *Daily*, 921 F.2d at 1007); *see Sasser*, 974 F.2d at 1550 (explaining "interdependence" as requiring such a shared objective). "[T]he

19

evidence must 'show that the [first] conspiracy was designed to further and to promote the success of the [second] conspiracy.'" *Leal*, 921 F.3d at 960 (second and third alterations in original) (quoting *Sasser*, 974 F.2d at 1550); *cf. United States v. Hamilton*, 587 F.3d 1199, 1208–09 (10th Cir. 2009) ("The requirement is satisfied 'if the alleged coconspirators were united in a common unlawful goal or purpose and if a defendant's activities facilitated the endeavors of another alleged coconspirator or facilitated the venture as a whole.'" (emphasis omitted) (quoting *United States v. Ailsworth*, 138 F.3d 843, 851 (10th Cir. 1998))); *United States v. Horn*, 946 F.2d 738, 740–41 (10th Cir. 1991) (explaining that "interdependence is present" when "the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole").

If, as here, there is not "direct evidence" that the separately charged conspiracies shared a single unlawful objective—evidence that would cogently support a finding of interdependence—at least primarily, "courts look for commonalities in time, place, and personnel. If two conspiracies involved the same people, occurred in the same place, and happened at roughly the same time, courts are more likely to find the conspiracies were interdependent." *Leal*, 921 F.3d at 961. But these factors are not intended to be exhaustive; more specifically, we may at least consider other factors that our case law has

20

previously shown have a bearing on the interdependence question.

In that regard, in seeking to determine whether separate conspiracy charges actually pertain to one conspiracy, we also have looked at whether there is a commonality among the conspiracies' overt acts. *See, e.g.*, *Daniels*, 857 F.2d at 1393 (noting that the indictments "each set forth different overt acts"); *Wilkett*, 655 F.2d at 1015 (concluding that the defendant could not be retried because the government sought to introduce the same evidence of overt acts in both the Eastern and Western Districts of Oklahoma). Of course, in drug-trafficking conspiracies prosecuted under 21 U.S.C. § 846, like those here, "an overt act is not a necessary element of conspiracy." *United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir. 1988); *see, e.g.*, *United States v. Shabani*, 513 U.S. 10, 11 (1994) ("This case asks us to consider whether 21 U.S.C. § 846, the drug conspiracy statute, requires the Government to prove that a conspirator committed an overt act in furtherance of the conspiracy. We conclude that it does not."). Consequently, the government is not obliged to plead overt acts when charging § 846 conspiracies. *See, e.g.*, *United States v. Staggs*, 881 F.2d 1527, 1530 (10th Cir. 1989) (en banc) ("Generally, an indictment is sufficient if it contains the elements of the offense charged . . . ."). And the government here did not do so in either the Texas indictment or the Colorado indictment. However, the record may still contain evidence bearing on the conspirators' activities that may assist

21

the court in determining whether two charged conspiracies are in fact one.

Furthermore, we also have taken into account whether there are any commonalities between the statutory violations that are the objects of the charged conspiracies. For example, in *United States v. Puckett*, 692 F.2d 663 (10th Cir. 1982), we noted that the defendant had been convicted of conspiring "to violate . . . 18 U.S.C. § 2314, which proscribes the interstate transportation of stolen or fraudulently obtained securities," in the first indictment, but that the second indictment "charged no violation of 18 U.S.C. § 2314." *Id.* at 668. After recounting this difference, we concluded that we were "satisfied the trial court's ruling that [the defendant] failed to establish the existence of a single conspiracy encompassing both the Oklahoma and Colorado charges, [was] not clearly erroneous." *Id.*

All of these factors may not be relevant to the double-jeopardy determination in a given conspiracy case. Importantly, the defendant "carr[ies] the burden of proving double jeopardy." *Mintz*, 16 F.3d at 1104; *accord Rodriguez-Aguirre*, 73 F.3d at 1025; *see also Leal*, 921 F.3d at 959 n.6 (noting "the defendant bears the burden of showing a double jeopardy violation" and rejecting invitation to adopt a burden-shifting framework that other circuits use). Consequently, courts are guided by the "arguments in [defendants'] briefing" in determining which factors are relevant to the resolution of the double-jeopardy

22

question.  *Leal*, 921 F.3d at 962.

**3**

Notwithstanding our articulation above of the controlling substantive standards, we acknowledge that the double-jeopardy law in our circuit is not pellucid on this matter in the context of separate conspiracy prosecutions that, as here, involve the same conspiracy statute.  And that lack of clarity is evident in the parties' briefing.  Thus, we pause to explain our process for discerning the controlling standards for resolving Mr. Mier-Garces's double-jeopardy challenge.  More specifically, we elaborate on our decision to generally follow the framework articulated in *Leal*.

**a**

In his opening brief, Mr. Mier-Garces invoked the so-called "totality of the circumstances test" and insisted that it was applicable in the context of separate conspiracy charges under the same conspiracy statute to resolve "the multiple/single conspiracy issue."  Aplt.'s Opening Br. at 15 (quoting *In re Grand Jury Proceedings*, 797 F.2d 1377, 1380 (6th Cir. 1986)).  As to the nature of that test, he observed the following:

> [w]hen applying the totality of the circumstances test, five general factors are to be considered: "(1) the time periods covered by the alleged conspiracies; (2) the places where the conspiracies are alleged to have occurred; (3) the persons charged as coconspirators; (4) the overt acts alleged to have been committed in furtherance of the conspiracies, or any other

23

descriptions of the offenses charged which indicate the nature and scope of the activities being prosecuted; and (5) the substantive statutes alleged to have been violated."

*Id.* at 15–16 (quoting *United States v. Alvarado*, 440 F.3d 191, 198 (4th Cir. 2006)).

Mr. Mier-Garces argued that this test should be applied in lieu of the well-established and seminal double-jeopardy test announced by the Supreme Court in *Blockburger*, because in cases such as this one, "the *Blockburger* analysis proves difficult of application since it assumes a violation of 'two distinct statutory provisions.'" *Id.* at 14 (italics added) (quoting *United States v. Allen*, 539 F. Supp. 296, 304 (C.D. Cal. 1982), which in turn quotes *Blockburger*, 284 U.S. at 304). In his opening brief, Mr. Mier-Garces did not mention interdependence—much less argue that interdependence is relevant to the double-jeopardy determination in circumstances such as these—and, more specifically, did not expressly argue that the Texas and Colorado conspiracies were interdependent. Rather, he simply argued the two conspiracies shared the general "common goal" of importing cocaine. *Id.* at 23. Only in his reply brief did Mr. Mier-Garces expressly make interdependence arguments. *See* Aplt.'s Reply Br. at 7–9.

In asking us to apply a totality-of-the-circumstances test, Mr. Mier-Garces relied exclusively on out-of-circuit authority—not our own. *See, e.g., United*

24

*States v. Sertich*, 95 F.3d 520, 523–24 (7th Cir. 1996) ("To determine whether the two charges arise out of one conspiracy, the court must look to such factors as whether they involve the same overt acts, people, places, or time period; whether they share similar objectives or modus operandi; or whether the two conspiracies depend upon each other for success."); *United States v. Smith*, 82 F.3d 1261, 1271 (3d Cir. 1996) ("The ultimate purpose of the totality of the circumstances inquiry is to determine whether two groups of conspirators alleged by the government to have entered separate agreements are actually all committed to the same set of objectives in a single conspiracy.").

This reliance on out-of-circuit authority is not surprising because, as the government pointed out in its response brief, *see* Aplee.'s Resp. Br. at 12, in the context of conspiracy prosecutions involving the same conspiracy statute, we have expressly rejected on more than one occasion the totality-of-the-circumstances test and applied instead what we have labeled a "same-evidence" test, *see Puckett*, 692 F.2d at 668 (electing to "adhere to the same evidence test" though the defendant "urge[d]" the panel "to employ the 'totality of the circumstances' test"); *see also Sasser*, 974 F.2d at 1549 n.4 (noting *Puckett*'s adherence to the same-evidence test, in responding to the defendant's "suggest[ion] that we adopt a 'totality of the circumstances' test"); *Jones*, 816 F.2d at 1486 ("This circuit applies the 'same evidence' test to determine the validity of a double jeopardy

claim."); *cf. United States v. Genser*, 710 F.2d 1426, 1429 & n.3 (10th Cir. 1983) (declining to "abandon" the "'same evidence' test in favor of a 'totality of the circumstances' [test]," where the question was whether "the offenses of 'distributing' and 'dispensing' controlled substances in violation of the Controlled Substances Act are the 'same offense' for double jeopardy purposes").

As we have formulated it, the same-evidence test "provides that offenses charged are identical in law and fact only if the facts alleged in one would sustain a conviction if offered in support of the other." *Puckett*, 692 F.2d at 667; *accord Mintz*, 16 F.3d at 1104; *Wilkett*, 655 F.2d at 1013. Notably, we have associated this test with *Blockburger*. *See, e.g.*, *Mintz*, 16 F.3d at 1104; *Puckett*, 692 F.2d at 667; *see also Sasser*, 974 F.2d at 1549 (referring to "the *Blockburger* 'same evidence' test"). In its response brief, the government asserted that the same-evidence test was the correct one to apply in addressing Mr. Mier-Garces's double-jeopardy challenge. The government further asserted, however, that "[t]he defendant must also show that the two conspiracies were interdependent and that the conspirators in each shared a single criminal objective." Aplee.'s Resp. Br. at 12.[4]

_____

[4] In his reply brief, Mr. Mier-Garces rightly pointed out that this is a "new position" for the government. Aplt.'s Reply Br. at 2. In opposing Mr. Mier-Garces's double-jeopardy motion, the government had urged the district court to apply the totality-of-the-circumstances test. *See* R., Vol. II, at 272 (Resp.

(continued...)

We decided *Leal* after the parties completed their briefing in this case. Accordingly, we requested supplemental briefing from them concerning *Leal*'s impact on their arguments about the appropriate substantive standards to apply to Mr. Mier-Garces's double-jeopardy challenge. Mr. Mier-Garces responds that "*Leal* establishes that *Blockburger*'s 'same evidence' test does not apply to this case." Aplt.'s Suppl. Br. at 5; *accord id.* at 1. He reasons further that *Leal* confirms that his initial approach was the correct one:

> Although the Court in *Leal* did not refer to the factors outlined above as a "totality of the circumstances" test, they are the same factors that other Circuits consider when examining the "totality of the circumstances" in order to determine whether successive conspiracy prosecutions violate the protections against double jeopardy. Similarly, the factors examined in *Leal* are the same factors that Mier-Garces examined in his opening and reply briefs . . . .

---

[4](...continued) to Def.'s Mot. to Dismiss, filed Mar. 14, 2017) ("When a defendant claims he was previously convicted of the same conspiracy, courts typically use a 'totality of the circumstances' test and consider several factors to determine whether the two charged conspiracies constitute the same offense for double jeopardy purposes."). Moreover, as the district court observed, neither the government nor Mr. Mier-Garces ever uttered the word "interdependence" in the hearing on Mr. Mier-Garces's double-jeopardy motion. *Id.*, Vol. III, at 516–17 (Tr. of Dist. Ct.'s Mots. Rulings, dated June 14, 2017) (noting that "neither side has really addressed" interdependence and that it has "not been raised"). But the burden to establish that the Texas and Colorado conspiracies were a single conspiracy is squarely on the shoulders of Mr. Mier-Garces, *see, e.g.*, *Leal*, 921 F.3d at 959 n.6; therefore, insofar as the record could have been, but was not, optimally developed on the critical issue of interdependence, Mr. Mier-Garces must bear any adverse consequences (whether great or small) of that failing.

27

*Id.* at 2.  And he tries to show us, through citations to his earlier briefing, that he has made at least some arguments concerning interdependence.  *See id.* at 2 n.1.

On the other hand, the government asserts that "*Leal* did not overrule this Court's 'same evidence' test, which remains the applicable test in this circuit.  It confirmed, however, that two conspiracies cannot be the same offense without interdependence."  Aplee.'s Suppl. Br. at 1.  Further, says the government, *Leal* underscores that where separate conspiracy charges are at issue in the double-jeopardy challenge, the "inquiry necessarily involves consideration of whether the second charge is based on a 'different set of facts' than the first."  *Id.* at 2 (quoting *Daniels*, 857 F.2d at 1393).  Under the government's reasoning, however, even the same-evidence test recognizes the determinative nature of the interdependence factor: "[i]n the parlance of the 'same evidence' test, where two conspiracies are not interdependent, evidence of one could not possibly prove the other."  *Id.* at 3.  Nevertheless, the government insists that "*Leal*'s focus on interdependence did not supplant the 'same evidence' test or mean that *only* interdependence matters. . . . Most significantly, because the essence of a conspiracy is the agreement, there must be a single agreement with a single set of objectives."  *Id.* (citation omitted).

**b**

After considering the parties' arguments, we have determined that *Leal*'s

28

framework helpfully synthesizes and clarifies our precedent and, consequently, embodies the proper substantive standards for resolving Mr. Mier-Garces's double-jeopardy challenge—which arises in the context of separate conspiracy prosecutions involving the same conspiracy statute. As we outline below, *Leal*'s framework underscores the central and determinative importance in our case law of interdependence in the assessment of whether two separately charged conspiracies are actually a single conspiracy. And, where there is not direct evidence of a single, shared unlawful objective, which would cogently support a finding of interdependence, the *Leal* framework allows for the consideration of other factors to establish interdependence, including primarily those that we have historically deemed relevant to the double-jeopardy analysis in the context of separate conspiracies. As for our well-worn same-evidence test, we recognize that "we must endeavor to interpret our cases in a manner that permits them to coexist harmoniously." *United States v. Hansen*, 929 F.3d 1238, 1254 (10th Cir. 2019). And, contrary to Mr. Mier-Garces's suggestion, we do not believe that *Leal* is irreconcilable with our same-evidence test; properly construed, that test can coexist harmoniously with the *Leal* framework. We address these matters below.

To begin, recall that *Leal*'s framework puts the factor of interdependence front and center in the inquiry concerning whether two (or more) separate

29

conspiracies based on the same statute are in fact one and makes the presence of a single, shared unlawful objective the key indicator of such interdependence. There, we held that

> [w]hen, as here, a defendant claims that a second conspiracy charge is for the same conspiracy as the first conspiracy charge and therefore is a double jeopardy violation, "the court must determine whether the two transactions [alleged in the charges] were interdependent and whether the [co-conspirators] were 'united in a common unlawful goal or purpose.'"

*Leal*, 921 F.3d at 960 (second and third alterations in original) (quoting *Mintz*, 16 F.3d at 1104). In this regard, *Leal* does not plow new ground: our prior case law has repeatedly centered its double-jeopardy analysis, in circumstances such as these, on an interdependence inquiry, focusing primarily on the presence of a single, shared unlawful objective to discern such interdependence. *See Daily*, 921 F.2d at 1007 ("Of principal concern is whether the conduct of the alleged co-conspirators, however diverse and far-ranging, exhibits an interdependence."); *id.* ("As to the existence of a single conspiracy, the focal point of the analysis is whether the alleged co-conspirators were united in a common unlawful goal or purpose."); *accord Carnagie*, 533 F.3d at 1239; *Mintz*, 16 F.3d at 1104; *Sasser*, 974 F.2d at 1550.

*Leal*, however, does highlight the relevance of "commonalities in time, place, and personnel" to the determination of whether two (or more) separate

conspiracies are actually interdependent and, thus a single conspiracy. 921 F.3d at 961. Although *Leal* helpfully provides us with a list of key commonalities, the pertinence of these factors to this interdependence determination—whether singly or, more often, in various combinations—is clearly evident across our case law, figuring prominently in numerous other cases. *See, e.g.*, *Mintz*, 16 F.3d at 1106 (concluding that the district court's finding that marijuana operations in Kansas and Florida were part of the same conspiracy was not clearly erroneous in part because "the ultimate goal was to mix the two types of marijuana [i.e., from Kansas and Florida] for sale *in New York*" (emphasis added)); *Sasser*, 974 F.2d at 1550 ("[The defendant] also has failed to demonstrate that any of the participants in the two conspiracies—besides [the defendant] himself and possibly [one co-conspirator]—had any knowledge that the other conspiracy existed. The two conspiracies operated independently of one another, with the success of each dependent exclusively on the individual labors of its own, separate participants."); *Daniels*, 857 F.2d at 1393 (concluding two distinct conspiracies existed because "the district court found that [the defendant's] conspiracy with his brother and others, which was the basis for the first indictment, terminated sometime during the summer of 1984 when [the defendant] 'split' with his brother, and that [the defendant] thereafter formed a new conspiracy with [a co-conspirator] to manufacture amphetamines"); *Puckett*, 692 F.2d at 668 (noting "a time period

31

overlap between the two indictments" before nevertheless concluding that the defendant had "failed to establish the existence of a single conspiracy encompassing both the Oklahoma and Colorado charges"); *United States v. McMurray*, 680 F.2d 695, 699 (10th Cir. 1981) (en banc) (holding that "one conspiracy has been shown to exist, and the defense of double jeopardy was valid," where "[w]e have here a limited time span with the same cast of characters throughout"); *Wilkett*, 655 F.2d at 1014 (in noting the commonalities between the two conspiracies, highlighting language in the indictments evincing the conspiracies' temporal overlap and stating that "[a]bout the only difference between the two indictments is that the Eastern District conspiracy is alleged to have commenced a few months earlier than the conspiracy in the Western District"). And, because *Leal*'s list of commonalities does not purport to be exhaustive, it does not preclude consideration of other factors that we have deemed relevant to double-jeopardy challenges in conspiracy cases involving the same conspiracy statute, such as whether there are commonalities among the conspiracies' overt acts, *see, e.g.*, *Wilkett*, 655 F.2d at 1015, or whether the objects of the charged conspiracies involved different statutes, *see, e.g.*, *Puckett*, 692 F.2d at 668. Accordingly, *Leal* provides a helpful, coherent framework for examining factors that we historically have found to be relevant.

Furthermore, acknowledging that "we must endeavor to interpret our cases

32

in a manner that permits them to coexist harmoniously," *Hansen*, 929 F.3d at

1254, we do not believe—contrary to Mr. Mier-Garces's suggestion—that *Leal* is

irreconcilable with our same-evidence test.  Specifically, even in our cases that

have nodded to the same-evidence test as binding precedent—where double-

jeopardy challenges were based on separate conspiracy charges—the *substance* of

the analysis has been materially congruent with the *Leal* framework.  We read

these cases as essentially standing for two important, broad propositions.  First, in

addressing double-jeopardy challenges based on the prosecution of separate

conspiracy charges, courts must conduct extensive factual analyses of the charged

conspiracies, focusing on commonalities—including time, place, and

personnel—in order to assess whether the conspiracies at issue are in fact one.

And, second, of primary importance in this factual inquiry is the question of

interdependence—i.e., whether the charged conspiracies are interdependent.  So

construed, these cases coexist harmoniously with *Leal*'s framework.

Almost two decades ago, in *Wilkett*, we insightfully observed the following:

> [T]he same evidence test is not always adequate for testing
> applicability of the former jeopardy principle where the two
> crimes charged are both conspiracies.  Conspiracies frequently
> involve several or even dozens of overt acts and may extend over
> several months or years.  Thus, it may frequently be possible to
> show the existence of a single conspiracy through proof of more
> than one set of facts.  If two charges of conspiracy are in fact
> based on a defendant's participation in a single conspiracy, the
> former jeopardy clause bars the second prosecution.  *As a
> consequence, it may be necessary to look beyond the question of*

33

*what evidence will be offered in proof of the two conspiracies, and to determine whether under all the circumstances a single conspiracy is present.*

655 F.2d at 1013–14 (emphasis added) (citations omitted).[5]  And, in practice, panels of our court have heeded *Wilkett*'s advice.  That is, notwithstanding their invocations of the same-evidence test, they have conducted extensive factual analyses of the charged conspiracies, focusing on commonalities—including time, place, and personnel—in order to assess whether the separate conspiracies at issue were in fact one.  *See Mintz*, 16 F.3d at 1104–06; *Sasser*, 974 F.2d at 1549–50; *Puckett*, 692 F.2d at 667–68; *see also United States v. Cardenas*, 105 F. App'x 985, 987–88 (10th Cir. 2004) (unpublished); *cf. United States v. Martinez*, 562 F.2d 633, 637–38 (10th Cir. 1977) (cited by *Puckett* in support of the same-

---

[5]  About one year later, in *Puckett*, we acknowledged such a critique of the same-evidence test by our sister circuits but did not expressly cite *Wilkett*. *See* 692 F.2d at 668 ("[W]e recognize that it has been criticized in recent years as an inadequate measurement of double jeopardy when applied to multiple prosecutions for conspiracy charges.").  One of the cases that *Puckett* cited was the Eighth Circuit's decision in *United States v. Tercero*, 580 F.2d 312 (8th Cir. 1978), where the court observed the following:

> By choosing one set of overt acts in one indictment and a different set of overt acts in another indictment, the government is able to carve one large conspiracy into several smaller agreements.  The "same evidence" test, which focuses on the evidence required to support a conviction for each indictment, provides no protection to the defendant from this type of prosecutorial action.

*Id.* at 315.

34

evidence test; performing extensive factual analysis focusing on such commonalities).

Notably, none of these same-evidence cases expressly rested their holdings on a determination as to whether the requirements of the same-evidence test were satisfied—that is, on an explicit conclusion regarding whether "the facts alleged in one [conspiracy] would sustain a conviction if offered in support of the other [conspiracy]." *Puckett*, 692 F.2d at 667.[6] In other words, these cases have not adhered rigidly to the language of that test. On the other hand, some of the key cases that have expressly invoked the same-evidence test have recognized the centrality of the interdependence factor to the determination of whether separately charged conspiracies are actually one. *See, e.g.*, *Mintz*, 16 F.3d at 1104; *Sasser*, 974 F.2d at 1550; *see also Cardenas*, 105 F. App'x at 987.

Therefore, we read our cases that have expressly invoked the same-evidence test as essentially standing for two important, broad propositions: stated

---

[6] Indeed, it is telling that, in declining to endorse the totality-of-the-circumstances test, we concluded in *Sasser* and *Puckett* that the result would have been the same under either test. *See Sasser*, 974 F.2d at 1550 ("[W]e conclude that under either the 'totality of the circumstances' test or the 'same evidence' test, the record demonstrates that two separate conspiracies existed and that Sasser's prosecution was not barred by the Double Jeopardy Clause."); *Puckett*, 692 F.2d at 667–68 ("[W]hether the 'totality of the circumstances' test or the 'same evidence' test is applied, the record before us indicates that the Colorado and Oklahoma trials concerned separate conspiracies.").

35

in summary form, they are, first, that in addressing double-jeopardy challenges based on the prosecution of separate conspiracy charges, courts must conduct extensive factual analyses of the charged conspiracies in order to assess whether the conspiracies at issue are in fact one; and second, that, of central importance in that factual inquiry is the question of interdependence. So construed, contrary to Mr. Mier-Garces's suggestion, these cases can coexist harmoniously with *Leal*'s framework.

To be sure, our cases invoking the same-evidence test have associated it with *Blockburger*. *See, e.g.*, *Mintz*, 16 F.3d at 1104; *Puckett*, 692 F.2d at 667; *see also Sasser*, 974 F.2d at 1549 (referring to "the *Blockburger* 'same evidence' test"). And yet, in *Leal*, we made clear that, in circumstances such as these where at issue are separate conspiracy charges involving the *same* statute, *Blockburger* is not applicable. *See* 921 F.3d 951.[7] However, even though there appears to be at first blush some conflict between our invocation of *Blockburger* in our same-evidence-test cases and our pronouncement about *Blockburger* in *Leal*, that

---

[7]     Recall that we said the following: "When the government charges a defendant under *separate* statutes for the same conduct, the test derived from *Blockburger* [], determines whether the crimes are the 'same offense' for double jeopardy purposes." *Leal*, 921 F.3d at 960 (emphasis added). On the other hand, "[w]hen the government charges a defendant with committing two (or more) conspiracies [under the same conspiracy statute], whether the charges are for the 'same offense' depends on whether they 'are in fact based on a defendant's participation in a single conspiracy.'" *Id.* (quoting *Daniels*, 857 F.2d at 1393).

36

conflict is not "*real*."  Bryan A. Garner et al., THE LAW OF JUDICIAL PRECEDENT § 36, at 300 (2016) (noting that "[a] court considering discordant decisions must first determine whether the perceived conflict between them is *real*" (emphasis added)); *accord Hansen*, 929 F.3d at 1256; *cf.* Michael Duvall, *Resolving Intra-Circuit Splits in the Federal Courts of Appeal*, 3 FED. CTS. L. REV. 17, 19 (2009) ("[I]nconsistency between two panel decisions is not necessarily an intra-circuit split, however.  A third panel will first attempt to reconcile the conflicting cases before concluding that a true intra-circuit split exists.").

To begin, as we read them, our same-evidence-test cases have never held that *Blockburger*'s test is controlling double-jeopardy precedent in the context of separate conspiracy prosecutions involving the *same* statute; therefore, *Leal*'s pronouncement, insofar as it declares *Blockburger* is not controlling in this context, does not engender a real conflict with those cases.  Specifically, it is most reasonable to read our same-evidence-test cases as historically relying on *Blockburger* to tacitly provide support—by way of analogy—for our court's formulation of a comparison-based, heavily fact-intensive double-jeopardy test: that is, the same-evidence test that inquires whether "the facts alleged in one [conspiracy] would sustain a conviction if offered in support of the other [conspiracy]."  *Puckett*, 692 F.2d at 667; *cf. McMurray*, 680 F.2d at 699 ("It is apparent that the issue as to whether one or more conspiracies existed in the cases

37

before us is to be resolved by an examination of the facts. The problem is a factual one and each case is unique.").

The *Blockburger* test provides a sound basis for such an analogy because it contemplates a comparison-based, double-jeopardy analysis—albeit one involving two separate statutes: "where the same act or transaction constitutes a violation of *two distinct statutory provisions*, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304 (emphasis added).

*Blockburger* would not reasonably have been cited in these same-evidence-test cases for more than such an analogy because the concern of the comparison-based *Blockburger* test is legal, whereas the focus of the comparison-based, same-evidence test is factual. In this regard, as we suggested in our overview of double-jeopardy principles, *see supra* Part II.B.2, the *Blockburger* test focuses on statutory elements—not facts or evidence,[8] *see Grady v. Corbin*, 495 U.S. 508, 521 n.12 (1990) ("The *Blockburger* test has nothing to do with the *evidence*

---

[8] Indeed, a leading same-evidence-test case, *Puckett*, supports this reading of our cases as using *Blockburger* as no more than a sound analogy, because—after describing evidentiary (i.e., factual) materials that courts may permissibly consider in applying the same-evidence test—*Puckett* cites a case that undertook *Blockburger*'s comparison-based, statutory-elements (i.e., legal) analysis, using a citation signal reserved for *analogous* authority, that is, "*cf.*" *See* 692 F.2d at 668 (citing *United States v. Cowart*, 595 F.2d 1023, 1029–30 (5th Cir. 1979)).

presented at trial.  It is concerned solely with the statutory elements of the

offenses charged."), *overruled on other grounds by Dixon*, 509 U.S. at 704; *see*

*also Currier*, 138 S. Ct. at 2153 (plurality op.) ("To prevent a second trial on a

new charge [under *Blockburger*], the defendant must show an identity of *statutory*

*elements* between the two charges against him; it's not enough that 'a substantial

overlap [exists] in the *proof* offered to establish the crimes.'" (second alteration

in original) (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975)));

*id.* at 2158 (Ginsburg, J., dissenting) ("To determine whether two offenses are the

'same,' [the Supreme] Court has held, a court must look to the offenses'

elements."); *see also Iannelli*, 420 U.S. at 785 n.17 ("[T]he Court's application of

the test focuses on the statutory elements of the offense.").[9]

 Therefore, *Blockburger* itself is not a same-evidence test but, rather, a

---

[9]  We, too, have recognized as much.  *See Angilau*, 717 F.3d at 787 ("In assessing whether the crimes require proof of different facts, we do 'not focus on the acts charged in the indictment . . . but rather on the elements of the crimes.'" (omission in original) (quoting *Davis*, 793 F.2d at 248)); *accord Wood v. Milyard*, 721 F.3d 1190, 1195 (10th Cir. 2013) ("[*Blockburger*] requires us to inquire whether each offense at issue contains an element not contained in the other." (quoting *United States v. Christie*, 717 F.3d 1156, 1173 (10th Cir. 2013))); *United States v. Pursley*, 474 F.3d 757, 769 (10th Cir. 2007) ("[W]e look to the elements of the two crimes for which [the defendant] was convicted to determine whether a double jeopardy violation exists."); *see also United States v. Isabella*, 918 F.3d 816, 847 (10th Cir. 2019) ("To determine what may be a lesser-included offense, courts focus on the textual elements of the offenses.  In general, statutes punish the 'same offense' when one offense contains all the elements of another even if it contains additional elements." (citation omitted)).

"same-elements" test, which "inquires whether each offense [i.e., of two offenses] contains an element not contained in the other; if not, they are the 'same offence.'" *Dixon*, 509 U.S. at 696; *see, e.g.*, *Lewis v. United States*, 523 U.S. 155, 182 (1998) (referring to the *Blockburger* test as "the 'same elements' test"); *Kansas v. Hendricks*, 521 U.S. 346, 370 (1997) (same).[10]  Thus, in our same-evidence-test cases, *Blockburger* has simply functioned historically as a sound analogy for our formulation of the same-evidence test—not as on-point, controlling precedent.  Therefore, insofar as *Leal*'s pronouncement amounts to a conclusion that *Blockburger* is not controlling in this context, it does not engender a real conflict with our same-evidence-test cases.

It is true that *Leal* went further than merely indicating that *Blockburger* was not controlling precedent: it indicated that, in circumstances such as these where

_____

[10]	We acknowledge that, on occasion, members of the Supreme Court have referred to the *Blockburger* test as the "same evidence" test.  *Sanabria*, 437 U.S. at 70 n.24; *see also Whalen v. United States*, 445 U.S. 684, 705 & n.1 (1980) (Rehnquist, J., dissenting) (same); *Ashe v. Swenson*, 397 U.S. 436, 463 (1970) (Burger, J., dissenting) (same).  However, "[t]his is a misnomer."  *Grady*, 495 U.S. at 521 n.12 ("Terminology in the double jeopardy area has been confused at best.  Commentators and judges alike have referred to the *Blockburger* test as a 'same evidence' test.  This is a misnomer." (citations omitted)); *see also* William H. Theis, *The Double Jeopardy Defense and Multiple Prosecutions for Conspiracy*, 49 SMU L. REV. 269, 272 & n.16 (1996) (noting that "[a]lthough this test [i.e., *Blockburger*] examines and compares the elements of the statutes in question, it has often been referred to as a 'same evidence' test," but the Supreme "Court has recently beg[u]n to use the more descriptive phrase – 'same elements'").

40

at issue are separate conspiracy charges involving the *same* statute, *Blockburger*'s rubric is not applicable at all. *See Leal*, 921 F.3d at 960 (noting that, in contrast to the circumstances where *Blockburger* applies, "[w]hen, as here, a defendant claims that a second conspiracy charge is for the same conspiracy as the first conspiracy charge and therefore is a double jeopardy violation, 'the court must determine whether the two transactions [alleged in the charges] were interdependent and whether the [co-conspirators] were "united in a common unlawful goal or purpose"'" (second and third alterations in original) (quoting *Mintz*, 16 F.3d at 1104)). But this *Leal* contention, too, is not really in conflict with our same-evidence-test cases. As we have discussed, *in practice*, panels of our court that have invoked the same-evidence test have not rigidly engaged in the comparison-based analysis that this test contemplates (i.e., the analysis for which *Blockburger* would function as a sound analogy). Instead, they have conducted extensive factual analyses of the charged conspiracies, focusing on commonalities—including time, place, and personnel—in order to assess whether the conspiracies at issue were in fact one—and have placed primary importance in this factual inquiry on the question of interdependence. Therefore, *in practice*, *Blockburger*'s work has always been negligible in these same-evidence-test cases—even as an analogy. Consequently, from this practical perspective, *Leal*'s pronouncement that *Blockburger* is inapplicable in circumstances such as these is

41

not materially inconsistent with our same-evidence-test cases, notwithstanding their linguistic invocation of *Blockburger*.

The upshot is that, contrary to Mr. Mier-Garces's suggestion, our same-evidence-test cases can coexist harmoniously with *Leal*'s framework. Stated otherwise, the apparent conflict between these cases and *Leal* is not real.

In sum, we have determined that *Leal*'s framework helpfully synthesizes and clarifies our precedent and, thus, embodies the proper substantive standards for resolving Mr. Mier-Garces's double-jeopardy challenge. *Leal*'s framework underscores the central and determinative importance in our case law of interdependence in the assessment of whether two separately charged conspiracies under the same conspiracy statute are actually a single conspiracy. And it provides a helpful, coherent framework for examining other factors that we historically have found to be relevant in our interdependence inquiry. Lastly, contrary to Mr. Mier-Garces's suggestion, we do not believe that *Leal* is really irreconcilable with our same-evidence-test cases nor does it really conflict with those cases' invocation of *Blockburger*. Accordingly, we proceed to apply *Leal*'s framework in resolving Mr. Mier-Garces's double-jeopardy challenge.

\* \* \*

At first blush, our adoption of the *Leal* framework puts Mr. Mier-Garces in a precarious position because he advanced interdependence arguments for the first

time ever in his appellate reply brief. *See, e.g.*, *United States v. Walker*, 918 F.3d 1134, 1153 (10th Cir. 2019) ("[A]rguments advanced for the first time in a litigant's reply brief will ordinarily not forestall a conclusion of waiver."); *Ave. Capital Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 886 (10th Cir. 2016) (noting that "[s]imply raising a related appeal point" to arguments that were made before the district court "was not enough to avoid forfeiture"); *United States v. Wayne*, 591 F.3d 1326, 1332 n.4 (10th Cir. 2010) ("Because [the appellant] raised [an] argument for the first time in her reply brief, she has waived it on appeal."). However, in an exercise of our discretion, we may—and do—put aside any questions of preservation. *See, e.g.*, *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013) ("[T]he decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary."). And, though our settled precedent (as noted above) forecloses our formal adoption of a totality-of-the-circumstances test, as Mr. Mier-Garces recognizes, *Leal*'s framework resembles the totality-of-the-circumstances test in that it permits consideration of similar factors—ones that unquestionably, in certain circumstances, have a bearing on the resolution of the interdependence question. Therefore, we proceed to consider Mr. Mier-Garces's arguments, insofar as they are relevant under the *Leal* framework.

**C**

Guided by Mr. Mier-Garces's arguments, we apply *Leal*'s framework in assessing whether the Colorado and Texas conspiracies were actually a single conspiracy, examining the following: (1) any shared unlawful purpose; (2) commonalities of (a) time, (b) place, and (c) personnel; (3) activities in furtherance of the conspiracies (i.e., uncharged overt acts); and (4) the statutory objects of the conspiracies. After doing so, we conclude that the district court did not clearly err in determining that Mr. Mier-Garces did not carry his burden of showing that the Colorado and Texas conspiracies were one conspiracy. Consequently, we uphold the court's denial of Mr. Mier-Garces's double-jeopardy motion.

**1**

As noted, the "the focal point of the analysis" for determining whether two charged conspiracies are interdependent is whether they are "united in a common unlawful goal or purpose," *Daily*, 921 F.2d at 1007; *accord Sasser*, 974 F. at 1550—understood in the narrow sense of "a *shared*, single criminal objective, not just similar or parallel objectives between similarly situated people," *Carnagie*, 533 F.3d at 1239 (quoting *Evans*, 970 F.2d at 670). Mr. Mier-Garces argues that both conspiracies—i.e., the Texas and Colorado conspiracies—had the same general goal of "distributing controlled substances for profit," Aplt.'s Reply Br. at 9, and, more particularly, that both conspiracies were aimed at "the importation of

44

cocaine from Mexico to El Paso, and the distribution of that cocaine from El Paso to other destinations," Aplt.'s Opening Br. at 23. However, it is at least questionable whether this was in fact a common criminal objective of the charged conspiracies. As the government points out, "*neither* the Colorado conspiracy *nor* the Texas conspiracy charged an agreement to import." Aplee.'s Resp. Br. at 25. Even putting that matter aside, "[t]his common goal, however, is not by itself enough to establish interdependence." *Carnagie*, 533 F.3d at 1239; *see id.* ("Although the [two conspiracies] had the same general objective—to profit from submitting fraudulent . . . loans—it does not necessarily mean that the separate groups were interdependent."). Even if a defendant is involved in two conspiracies that have the same general goal of distributing drugs, he must demonstrate that the conspiracies have "a *shared*, single criminal objective, not just similar or parallel objectives between similarly situated people." *Id.* (quoting *Evans*, 970 F.2d at 670). More specifically, the defendant must demonstrate that "the [first] conspiracy was *designed* to further and to promote the success of the [second] conspiracy." *Leal*, 921 F.3d at 960 (alterations in original) (emphasis added) (quoting *Sasser*, 974 F.2d at 1550); *see Hamilton*, 587 F.3d at 1208–09.

Mr. Mier-Garces argues that the money earned in the Albuquerque transaction undertaken pursuant to the Texas conspiracy facilitated the venture as a whole because a "one-time agreement to assist in a one-time collection of

45

money" can be "calculated to, and in fact [can] (albeit not to the fullest extent), meaningfully contribute to the success of [the larger] drug operation." Aplt.'s Reply Br. at 8 (quoting *Hamilton*, 587 F.3d at 1209). In this connection, he cites *United States v. Dickey*, 736 F.2d 571 (10th Cir. 1984), where ten defendants were involved in transactions to import and then distribute drugs. We concluded there that "[t]he record in this case clearly establishe[d] that the success of the overall scheme of distributing drugs for profit depended upon the successful completion of each of the transactions." *Id.* at 582. This was because "[e]ven the remote members of the conspiracy were undeniably dependent on the success of each transaction to ensure the continuing prosperity of the overall scheme," and "[t]he success of each transaction was essential to attain [the] ultimate goal of profitability." *Id.* In coming to this conclusion, we relied on the principle that "[w]here large quantities of [drugs] are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know." *Id.* (alterations in original) (quoting *United States v. Watson*, 594 F.2d 1330, 1340 (10th Cir. 1979)); *accord United States v. Nunez*, 877 F.2d 1470, 1473 (10th Cir. 1989) (citing *Watson*, 594 F.2d at 1340).

However, Mr. Mier-Garces's citations to *Dickey* and similar cases are unconvincing. To start, in each of the cases Mr. Mier-Garces cites on this

point—*Hamilton*, 587 F.3d at 1206; *Horn*, 946 F.2d at 741; *Daily*, 921 F.2d at 1007; *Nunez*, 877 F.2d at 1473; *Dickey*, 736 F.2d at 581—the defendant was challenging a jury's conclusion that there was only one conspiracy, either by arguing that there was a variance or some form of insufficiency of the evidence. In those cases, we were required to "view all of the evidence, both direct and circumstantial, in the light most favorable to the government." *Dickey*, 736 F.2d at 581; *see also United States v. Fishman*, 645 F.3d 1175, 1189 (10th Cir. 2011) (explaining that once a jury has determined that the defendant was part of a single charged conspiracy, "[i]n reviewing a claimed variance, '"we view the evidence and draw all reasonable inferences therefrom in the light most favorable to the government, asking whether a reasonable jury could have found [the defendant] guilty of the charged conspirac[y] beyond a reasonable doubt"'" (second and third alterations in original) (quoting *United States v. Caldwell*, 589 F.3d 1323, 1328 (10th Cir. 2009))). In other words, when reviewing an argument that a variance existed between the conspiracy charged and that proven at trial, we were construing the facts in the light most favorable to the government's view that a single conspiracy existed. Here, alternatively, we are asking whether the district court's opposite finding, i.e., that two conspiracies existed, was clearly erroneous. A conclusion here that the district court did not clearly err in finding separate conspiracies would not necessarily be at odds with the distinct determination that

47

a reasonable factfinder could have found one conspiracy on the same facts, construing those facts in the light most favorable to the government.

Furthermore, even setting aside this distinction, we still think Mr. Mier-Garces's argument is unconvincing. While "it is not necessary that each conspirator agree with all others or even know of the others, or have contact with each of them," *McMurray*, 680 F.2d at 698, there must be "a *shared*, single criminal objective, not just similar or parallel objectives between similarly situated people," *Evans*, 970 F.2d at 670. While the Colorado and Texas conspiracies had "parallel" objectives, Mr. Mier-Garces fails to convincingly explain how they were mutually reinforcing.

His failure on this point is underscored by *Leal*. There, we also acknowledged the principle—cited above—that "[w]here large quantities of narcotics are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know." 921 F.3d at 962 (alteration in original) (quoting *Watson*, 594 F.2d at 1340). But we held that this general principle did not establish interdependence. *Id.* at 962. Even though members of the two distinct conspiracies in *Leal* "each aspired to 'distribute large amounts of narcotics . . . for profit,' that would not establish they were pursuing that goal as part of a shared endeavor." *Id.* (citation omitted). As in *Leal*, though

48

it is clear that "the purpose of each [conspiracy] was to sell drugs . . ., the record lacks evidence that the [Texas] and [Colorado] [conspirators] shared that purpose with each other, and a shared objective is a necessary predicate for interdependence." *Id.* Without more, we cannot presume that the agreement between Mr. Mier-Garces and the confidential informant underlying the Texas conspiracy was an agreement to join "a wide-ranging venture," like the Colorado conspiracy. *Id.* (quoting *Watson*, 594 F.2d at 1340).

Thus, we conclude that the district court did not clearly err in concluding that there was no direct evidence of a shared, single criminal objective that would permit a finding of interdependence. However, even without such direct evidence, courts may still conclude that two purportedly distinct conspiracies are in fact one conspiracy based on, *inter alia*, "commonalities in time, place, and personnel." *Id.* at 961. Therefore, guided by Mr. Meir-Garces's arguments, we consider other factors that nevertheless may demonstrate the existence of a single conspiracy.

## 2

"[C]ommonalities in time" can be relevant to whether two purportedly distinct conspiracies are in fact one. *Id.*; *accord McMurray*, 680 F.2d at 699. The superseding indictment in this case, i.e., the Colorado conspiracy, charged that a conspiracy existed from December 8, 2013, until March 22, 2016. The

49

superseding indictment in the Texas conspiracy charged that a conspiracy existed for one day—i.e., March 8, 2015—a day during the period of the longer, Colorado conspiracy. Thus, there was at least a one-day overlap in the two conspiracies, i.e., March 8, 2015. We conclude that this one-day overlap, situated as it was in the midst of a two-and-a-half-year conspiracy, is not a strong indicator that the two conspiracies were in fact one.

We reached such a conclusion over forty years ago in a similar case involving two drug-trafficking conspiracies in *Martinez*, where the defendants "emphasize[d] the fact that December 11, 1973, the approximate date of the alleged conspiracy charged in the Texas indictment, f[ell] within the time period covered by the indictment in this Oklahoma case, which cover[ed] the period from about November, 1973, until January, 1977." 562 F.2d at 635. We observed that "[t]he mere fact that the same parties are charged with being members of two conspiracies, and that both conspiracies concerned transactions in the same items and overlapped in time, does not establish that the two conspiracies are the same." *Id.* at 638. And we concluded that the district court did not clearly err in determining that the defendant presented insufficient proof that the two conspiracies involved the same unlawful agreement. *See id.* *Martinez* supports our determination here.

Furthermore, more recently, a panel of our court arrived at a like

50

conclusion in an unpublished decision. *See Cardenas*, 105 F. App'x at 985.

There, the defendant pleaded guilty to a one-day conspiracy that had occurred in

November 2000. *Id.* at 986. He argued that this plea barred a subsequent

indictment for a six-year conspiracy spanning from 1996 to 2002. *Id.* Our panel

rejected this argument: "[t]he fact that the two alleged conspiracies overlapped

for a single day does not establish that they were interdependent." *Id.* at 988.

*Cardenas*'s reasoning, too, is persuasive and supports our conclusion here.

Notably, Mr. Mier-Garces points us to Fifth Circuit cases where

commonalities in time were found to militate in favor of a finding that one

conspiracy existed. *See United States v. Rabhan*, 628 F.3d 200, 205 (5th Cir.

2010); *United States v. Winship*, 724 F.2d 1116, 1126 (5th Cir. 1984). But the

commonalities in time in those cases were more substantial than the one day here,

and we do not find them persuasive. In short, we conclude that the one-day

overlap here does not appreciably undermine the district court's finding of

separate conspiracies, much less render it clearly erroneous.

**3**

Likewise, the geographic overlap here does not meaningfully point in the

direction of one conspiracy. The Texas indictment was based on Mr.

Mier-Garces's agreement to distribute cocaine from El Paso to Albuquerque. All

of the conduct underlying the conspiracy occurred either in the greater El Paso

51

area or in Albuquerque.  Mr. Mier-Garces asked the confidential informant to drive cocaine to Albuquerque, he took a vehicle from the confidential informant in El Paso, loaded it with cocaine at his home in neighboring Chaparral, New Mexico, and returned it to the informant in El Paso believing that the informant would then drive the vehicle to Albuquerque.  On the other hand, though the Colorado conspiracy also involved Mr. Mier-Garces's loading-and-unloading activities in El Paso, there was an entirely different geographic market targeted for the cocaine distribution—that is, Denver, Colorado.  Indeed, the evidence presented to the Colorado grand jury centered on the co-conspirators' activities in the greater Denver area.  More specifically, that grand jury heard no evidence concerning the 10.6-kilogram load of cocaine that went to Albuquerque—that is, the sole load at issue in the Texas conspiracy.

Thus, while there was geographic overlap as to *Mr. Mier-Garces's* conduct in the two conspiracies, this does not necessarily tell us much about the overlap of the conspiracies more generally.  As the district court noted,

> [a] defendant in one jurisdiction . . . could be involved in multiple conspiracies[.]  [E]ven though his conduct in [one jurisdiction] all took place in [that jurisdiction], that would not preclude him from being involved in multiple conspiracies one or more of which may extend [beyond] the borders of [that jurisdiction].

R., Vol. III, at 512.  The court's reasoning is sound.  Whenever one individual is involved in multiple conspiracies, there is likely to be at least some geographic

overlap between those conspiracies. And here the evidence about the geographic overlap of the remainder of the conspiracies' activities is lacking. Most significantly, there is no indication that the extensive agreement to distribute cocaine in the greater Denver area had a relationship to the individual agreement to sell cocaine in Albuquerque.

Compare the situation here to that in *Mintz*. There, we concluded that the district court's finding that marijuana operations in Kansas and Florida were part of the same conspiracy was not clearly erroneous in part because "the ultimate goal was to mix the two types of marijuana [i.e., from Kansas and Florida] for sale in New York." 16 F.3d at 1106. The planned convergence in a single location (i.e., New York) was strong evidence that a single conspiracy existed. But here the district court was presented with minimal evidence that these conspiracies in different states interacted with each other or that they were pursuing a unified "ultimate goal." *Id.*

Our assessment that the evidence of geographic overlap does not meaningfully point in the direction of one conspiracy is further underscored by a comparison with the Tenth Circuit panel's decision in *United States v. Rodriguez-Moreno*, 215 F.3d 1338, 2000 WL 504858 (10th Cir. 2000) (unpublished table decision). There, marijuana was imported from Mexico and stored in McAllen, Texas. *Id.* at *1. The defendant was charged with one

53

conspiracy in Texas based on an agreement to distribute some of the marijuana stored in McAllen throughout Texas. *Id.* He then later was charged in Oklahoma with a conspiracy to distribute marijuana from McAllen to Atlanta, Georgia; Chicago, Illinois; and Tulsa, Oklahoma. *Id.* at *2. The panel concluded that the conspiracies were not interdependent, and the defendant's prosecution under the second indictment did not violate the Double Jeopardy Clause despite this overlap: "[t]he fact that [the storage location in McAllen] was used in both conspiracies does not establish an interdependence between the conspiracies." *Id.* at *4; *see Leal*, 921 F.3d at 961 (citing *Rodriguez-Moreno* as persuasive authority and as an instance where "two drug distribution conspiracies tied to the same city were distinct"). Likewise, we think the evidence before the district court connecting both conspiracies to El Paso did not shed much light on whether the two conspiracies were actually one.

Finally, Mr. Mier-Garces also notes that when the government offered a factual basis in support of his guilty plea in the Western District of Texas, it stated that "drug couriers would then transport the drugs to destination cities in the U.S. and the money couriers would smuggle the drug proceeds back into Mexico." Suppl. App., Vol. I, Ex. S, at 44 (Tr. of Guilty Plea Hr'g, dated Mar. 30, 2016). However, this general reference to the drug couriers' transportation activities in the United States is insufficient to establish that the Colorado and

54

Texas conspiracies were one, much less does it significantly undercut the district court's factual finding to the contrary. There is scant evidence that the agreement between Mr. Mier-Garces and the confidential informant underlying the Texas conspiracy extended beyond the single transaction to Albuquerque.

In sum, we conclude that, though both conspiracies had in common Mr. Mier-Garces's activities in the greater El Paso area, this geographic overlap does little to advance Mr. Mier-Garces's argument that the conspiracies were one.

**4**

Next we consider any commonalities in personnel between the conspiracies. This factor supports the district court's finding that the Texas and Colorado conspiracies were separate conspiracies. In particular, other than Mr. Mier-Garces, none of the individuals named in the Colorado indictment were named in the Texas indictment and vice versa. The only named conspirator in the Texas indictment was Mr. Mier Garces; otherwise the indictment just referred generally to "known and unknown" co-conspirators. R., Vol. II, at 66. Whatever door for speculation this common, but opaque, indictment reference may have generated—*see, e.g.*, *United States v. Lance*, 536 F.2d 1065, 1068 (5th Cir. 1976) (noting that "the indictment alleged that the two conspired with each other and other unknown persons.")—was firmly closed shut by the government at the hearing, when it presented evidence that known conspirators in the Colorado

55

conspiracy, including those charged and identified in the Colorado indictment, were not conspirators in the Texas conspiracy, R., Vol. III, at 207–08. And "the mere presence of one common conspirator—here, Mr. [Mier-Garces]—will not establish interdependence." *Leal*, 921 F.3d at 963; *see Carnagie*, 533 F.3d at 1240 ("[T]he mere fact" that multiple defendants interact with one central defendant "does not establish interdependence."); *Evans*, 970 F.2d at 670 (noting that "a single conspiracy does not exist solely because many individuals deal with a common central player; they must be interconnected in some way"); *Martinez*, 562 F.2d at 638 ("Where various parties conspire with one common conspirator, the evidence may nevertheless show that separate conspiracies were involved and that no one combination embraced the objectives of the others.").

Mr. Mier-Garces's primary argument to the contrary centers on the role of an individual that Mr. Mier-Garces refers to as "El Señor." He claims that El Señor was "the Mexico-based source of the cocaine" and that he and Mr. Mier-Garces were "the constants, and the central characters" in both the Texas and Colorado conspiracies. Aplt.'s Opening Br. at 22; *see id.* (asserting that the Texas and Colorado conspiracies "revolve[d] around the same two, central characters," namely, Mr. Mier-Garces and El Señor). But the central problem with this argument is that Mr. Mier-Garces did not present information about El Señor to the district court at the time it ruled on the motion to dismiss; indeed,

56

Mr. Mier-Garces did not even mention El Señor in his motion to dismiss or at the double-jeopardy hearing. Accordingly, he cannot rely on any argument concerning El Señor now. *See Regan-Touhy*, 526 F.3d at 648; *Hertz*, 370 F.3d at 1019; *Theriot*, 185 F.3d at 491 n.26. To be sure, Mr. Mier-Garces's motion to dismiss did discuss a Mexico-based drug trafficker, El Muñeco, with whom Mr. Mier-Garces admittedly worked in smuggling narcotics into the United States. But Mr. Mier-Garces does not even mention El Muñeco in either his opening or reply briefs. Of course, it is not inconceivable that El Señor and El Muñeco are two names for the same person, but Mr. Mier-Garces does not direct us to evidence to this effect and certainly did not present any to the district court at the hearing. Accordingly, based on the evidence before it, the court was in no position to make the finding that Mr. Mier-Garces urges now—specifically, that El Señor and Mr. Mier-Garces were "the constants, and the central characters" in both the Texas and Colorado conspiracies. Aplt.'s Opening Br. at 22.

Moreover, even if we could assume that El Señor and El Muñeco are the same person, the evidence about that person that was before the district court at the time of its ruling does not establish an overlap in personnel such that this factor would significantly favor a finding of one conspiracy. Mr. Mier-Garces's post-arrest interviews mentioned El Muñeco's role in coordinating the smuggling of narcotics into the United States. But even if this individual also had

57

knowledge about the conspiracies to distribute cocaine to Albuquerque and Denver, this would not necessarily establish that the two conspiracies were one. *Sasser* underscores this point. There, the defendant "failed to demonstrate that any of the participants in the two conspiracies—besides [the defendant] himself and possibly [one co-conspirator]—had any knowledge that the other conspiracy existed." 974 F.2d at 1550. Even with two potential individuals aware of both conspiracies, the court concluded that "[t]he two conspiracies operated independently of one another, with the success of each dependent exclusively on the individual labors of its own, separate participants." *Id.* Likewise here, even if Mr. Mier-Garces and El Muñeco provided some minimal overlap of personnel, there is no evidence that any of the courier members of the Colorado conspiracy had any knowledge of the Texas conspiracy. *Cf. Cardenas*, 105 F. App'x at 988 ("[E]ven assuming the same co-conspirators were the source of the methamphetamine that [the defendant] was charged with distributing in both cases, that fact does not by itself establish the two alleged conspiracies were interdependent.").

In sum, we conclude that this factor does not undercut the district court's finding of separate conspiracies, much less does it serve to make that finding implausible.

**5**

As noted, the government was under no obligation to plead overt acts in the Texas and Colorado indictments because they charged drug-trafficking conspiracies under 21 U.S.C. § 846, and it did not do so. *See, e.g.*, *Savaiano*, 843 F.2d at 1294. But the government introduced evidence at the hearing concerning the conspirators' activities in furtherance of the charged conspiracies—that is, their uncharged overt acts—and that evidence was consistent with the district court's finding of separate conspiracies. Recall that the Texas conspiracy was based on Mr. Mier-Garces's agreement to load cocaine into a vehicle bound for Albuquerque on one distinct day. R., Vol. III, at 156–57, 209. The Colorado conspiracy, on the other hand, concerned Mr. Mier-Garces's agreement to load cocaine into multiple vehicles that Mr. Lucero, Ms. Mota, Mr. Neufeld-Reimer, and Ms. Wieler de Neufeld drove to Denver and then the subsequent distribution of that cocaine in Denver. No information about the cocaine load that was the subject of the Texas indictment was presented to the Colorado grand jury. Thus, the conspiracies involved different conspiratorial activities (i.e., uncharged overt acts). *See id.* at 513–14 (district court noting "that the Texas case is specific to one 10.6 kilogram load of drugs that was intended to go from Texas to New Mexico. . . . [T]he Texas case is limited to that Texas to New Mexico transaction, and does not touch upon, in any way, shape or form loads coming up into Colorado."). As such, this factor lends supports to the district court's finding of

separate conspiracies.

Mr. Mier-Garces makes one principal argument to the contrary.[11]  He argues that, though the two charged conspiracies "differ[ed] in the particulars of how th[eir] goal was to be accomplished," the fact that the government moved to introduce at the Colorado trial Mr. Mier-Garces's guilty plea in the Western District of Texas—on the ground that it was relevant to show his knowledge and lack of mistake under Federal Rule of Evidence 404(b)—provides support for the conclusion that the two conspiracies were in fact "a single conspiracy."  Aplt.'s Opening Br. at 23.  But the notice that the government filed regarding its intention to introduce this information came only after the district court had denied the double-jeopardy motion.  *Compare* R., Vol. I, at 245–46 (United States' Notice of Intent to Introduce Evidence Which May Qualify as Fed. R. Evid. 404(b) Evidence, filed June 20, 2017), *with id.*, Vol. III, at 517–18 (evincing the court's ruling on motion to dismiss, rendered on June 14, 2017).  Accordingly, this government action cannot provide a basis for determining that

---

[11]  Confronted by the disparate activities of the Texas and Colorado conspiracies, Mr. Mier-Garces also falls back on his contention that the conspiracies had a "common goal" involving "the distribution of th[e] cocaine from El Paso to other destinations."  Aplt.'s Opening Br. at 23.  But, as noted *supra*, this argument concerning a general unlawful goal sheds little light on the question of whether the two conspiracies were in fact one.

the court erred in ruling on that motion.[12]  We thus reject this argument and

conclude that this factor favors the district court's finding of separate

conspiracies.  And, put another way, this factor does nothing to indicate that the

court's finding was clearly erroneous.

**6**

Finally, both indictments alleged conspiracies to violate the same drug-

trafficking statute, namely 21 U.S.C. §§ 841(a)(1).  Though as Mr. Meir-Garces

argues, the fact that charged conspiracies involve violations of the same statute

may provide some measure of support for a finding of a single conspiracy, we do

not find this fact to be particularly meaningful here.  *See United States v. Dortch*,

5 F.3d 1056, 1063 (7th Cir. 1993) (noting that "the fact that both indictments

charged violations of the same statute, 21 U.S.C. § 841, is the weakest evidence

on which [the defendant] relies" because "[o]ne individual can certainly join more

than one conspiracy to distribute drugs").

\* \* \*

---

[12]     Moreover, on the merits, a nearly identical argument was rejected in *Leal*.  921 F.3d at 965 ("The Government's attempt to show common plan, knowledge, and lack of mistake or accident under Rule 404(b) may show that Mr. Leal handled the deals in a similar manner, but it does not show the conspiracies were interdependent.").  Consistent with *Leal*'s reasoning, it is not clear why Rule-404(b) evidence from the Texas conspiracy that tended to show that Mr. Mier-Garces was familiar with the kind of drug-trafficking techniques employed in the Colorado conspiracy would tell us anything about whether the Texas conspiracy and the Colorado conspiracy were a single conspiracy.

61

In sum, on this record, we cannot conclude that the district court clearly erred in finding that the Texas and Colorado conspiracies were separate and not one single conspiracy. Thus, we find no error in the district court's denial of Mr. Mier-Garces's motion to dismiss on double-jeopardy grounds.

## III

Mr. Mier-Garces separately argues—albeit briefly—that the district court erred in applying U.S.S.G. § 2D1.1(b)(12)'s enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance. We conclude that the district court did not err in applying this enhancement.

## A

"When reviewing a district court's application of the Sentencing Guidelines, we review legal questions *de novo* and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Craig*, 808 F.3d 1249, 1255 (10th Cir. 2015) (quoting *United States v. Doe*, 398 F.3d 1254, 1257 (10th Cir. 2005)). "A factual finding is clearly erroneous 'only if [it] is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made.'" *Id.* (alteration in original) (quoting *United States v. Mullins*, 613 F.3d 1273, 1292 (10th Cir. 2010)).

## B

62

Section 2D1.1(b)(12) of the Guidelines provides that "[i]f the defendant maintained a premises for the purposes of manufacturing or distributing a controlled substance, increase [the offense level] by 2 levels." "Among the factors the court should consider in determining whether the defendant 'maintained' the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." U.S.S.G. § 2D1.1 cmt. n.17. Additionally, "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises." *Id.*

In determining whether manufacturing or distributing a controlled substance was the primary or principal use of the premises, "the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." *Id.* Our cases have additionally looked to the following factors when evaluating the application of this enhancement:

> (1) the frequency and number of drugs sales occurring at the home; (2) the quantities of drugs bought, sold, manufactured, or stored in the home; (3) whether drug proceeds, employees, customers, and tools of the drug trade (firearms, digital scales, laboratory equipment, and packaging materials) are present in the home, and (4) the significance of the premises to the drug

63

venture.

*United States v. Murphy*, 901 F.3d 1185, 1191–92 (10th Cir. 2018); *accord United States v. Lozano*, 921 F.3d 942, 946 (10th Cir. 2019).

C

Mr. Mier-Garces argues that the district court "erred in concluding that the government had proved by a preponderance of the evidence that Mier-Garces' home in Chaparral was used primarily or principally for distributing a controlled substance." Aplt.'s Opening Br. at 27. We disagree.

The district court made the factual finding that the primary purpose of the property was the storage or distribution of controlled substances. That finding was based on the court's subsidiary findings that "there's no question that the way this worked is drugs came up from Mexico, [and] they were stored [at the house] until they were transferred up to other parts of the United States." R., Vol. IV, at 934. And the court further found that "[t]he reverse process ensued, when money was coming back. At a bear [sic] minimum, [the home] [wa]s for storage." *Id.* The court relied on pictures of the home that demonstrated that it was a place "that a person does not really live in." *Id.* at 935. This was because the pictures revealed that there was "no furniture," no refrigerator, "no stove," "stuff thrown all over the floors," and "a mess" that rendered the home "not usable." *Id.*; *see* Suppl. App., Vol. I, Ex. 57 (photographs of Mr. Mier-Garces's home).

64

In addition to these facts supporting the conclusion that Mr. Mier-Garces only stayed at the home temporarily, while using it primarily or principally to store or distribute drugs, the court relied on "Mr. Mier-Garces' own statement that he was moving drugs every—at least twice a month, which is a repetitive, continuing use of that property to store, load, unload cars, store drugs and money, unload and load cars." R., Vol. IV, at 936. The court also relied on Mr. Mier-Garces's statement to the probation officer that "he doesn't take mail at that address." *Id.* Because "it looks like no one stays there with any regularity" and "there is repetitive drug activity coming off of that property," the court found the evidence "tips, by a preponderance, in favor of the adjustment." *Id.* Finally, as the government notes, *see* Aplee.'s Resp. Br. at 31–32, the Probation Office noted in the PSR that Mr. Mier-Garces "spent the majority of his time at his mother's address," not the residence at issue, R., Vol. II, at 598 (PSR, dated Jan. 26, 2018)—a fact that he did not dispute.

In our view, for two salient reasons, there can be little (if any) doubt that the district court's determination to impose the enhancement was not clearly erroneous or otherwise improper. First, the commentary to the Guidelines makes clear that "storage of a controlled substance for the purpose of distribution" can qualify as maintaining the premises for the purposes of distributing controlled substances. U.S.S.G. § 2D1.1 cmt. n.17; *see Murphy*, 901 F.3d at 1194

(concluding that the enhancement applied because the evidence led to the "reasonable inference that [the defendant] used his home to store drugs for distribution outside his home"). Thus, Mr. Mier-Garces's admitted use of the home to store drugs and conceal them in vehicles for transport on a bi-weekly basis amply supports the district court's conclusion that a primary or principal use of the home was the distribution of controlled substances. See R., Vol. IV, at 534–35, 544–45 (describing use of the home for loading vehicle with drugs for couriers).

Second, the district court's finding that Mr. Mier-Garces did "not really live" in the house is not clearly erroneous. Mr. Mier-Garces argues that his "period of incarceration should not be extended because he is untidy." Aplt.'s Opening Br. at 27–28. But Mr. Mier-Garces was not punished for failing to clean his room; the extreme untidiness was only relevant because it indicated that he did not actually live at the home. And the significance of that fact has not been lost on prior panels of this court: they have noted that similar features of a home may indicate that it is primarily or principally being used for the distribution of controlled substances. *See United States v. Mays*, 606 F. App'x 911, 916 (10th Cir. 2015) (unpublished) (noting "[t]he house had no bedroom furniture" before affirming application of the enhancement); *United States v. Cortez-Diaz*, 565 F. App'x 741, 748 (10th Cir. 2014) (unpublished) (noting that "[t]he court also

66

found it significant that the house had no furniture" before concluding that the defendant "maintained the house to store or distribute a controlled substance").

Mr. Mier-Garces also attempts to explain away the fact that he did not receive mail at his home as being caused by his frequent travel; he thus argues that it made sense for him to have his mail sent to his mother's home. Aplt.'s Opening Br. at 27–28. But this at most shows that multiple inferences were available to be made—some innocent, and some suggestive of the primary or principal use of the home for drug trafficking. It does not show that the district court clearly erred. *See, e.g.*, *United States v. Cortes-Gomez*, 926 F.3d 699, 708 (10th Cir. 2019) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it . . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985))). And while Mr. Mier-Garces points to other features of the home that purportedly demonstrate that he lived there,[13] none of

---

[13] Aplt.'s Opening Br. at 27–28 ("[T]he photographs show that there is food in the kitchen and what appear to be clean dishes drying in one half of the sink. There are draperies and blinds on the windows. The bedroom closet is full of clothes and shoes. There is a bed, with pillows, sheets and blankets. There is a nightstand with a jar of change on it and what appears to be packages of medicine. There is a flat screen TV on a dresser in the bedroom and a satellite dish on the roof. There are decorations hanging on the walls, and trinkets like model cars and animal sculptures lining the shelves. The bathroom shower has a

(continued...)

these features demonstrate that the district court's conclusion that "no one stays there with any regularity" is clearly erroneous. R., Vol. IV, at 936.

Furthermore, even if Mr. Mier-Garces had stayed there regularly, the regular and repeated use of the home for drug trafficking would still have provided the district court with ample basis to find that a primary or principal use of the home was for drug distribution. *See Murphy*, 901 F.3d at 1191 ("[O]ne may use his home (in the broad sense of the word) for lawful purposes 100% of the time and also use it (in the same broad sense of the word) for unlawful drug activity 100% of the time. In other words, both simultaneous uses may well be primary." (underlining omitted)); *see also id.* ("A substantial drug distribution that regularly and quickly passes through the home (two or three days) on a bi-monthly or tri-monthly basis may qualify as a primary use of the premises for drug-related purposes . . . .").

In sum, we conclude that the district court did not err in applying this enhancement.

## IV

For the foregoing reasons, we conclude that the district court correctly determined that the Double Jeopardy Clause was not violated and that a

---

[13](...continued)
curtain on it and what appears to be soap and shampoo on the shelves inside.").

sentencing enhancement under U.S.S.G. § 2D1.1(b)(12) was appropriate.  We thus

**AFFIRM** the court's judgment.